Opinion
 

 BAMATTRE-MANOUKIAN, J.
 

 This case arises from a decision by the president of San Jose State University denying tenure and promotion to a probationary faculty member. The matter was submitted to arbitration pursuant to the grievance procedure set forth in the collective bargaining agreement between the employer, the trustees of the California State University (hereafter CSU), and the California Faculty Association (hereafter CFA), which represented the aggrieved faculty member. The arbitrator overturned the president’s decision and directed that the university grant tenure to the faculty member and promote her to the rank of associate professor. CSU then filed a motion in superior court to vacate the arbitration award.
 

 The superior court granted the motion to vacate, pursuant to Code of Civil Procedure section 1286.2, subdivision (d), on the ground that the arbitrator had exceeded the authority given him under the terms of the collective bargaining agreement and the parties’ stipulated submission. The court ordered that the matter be remanded for a new hearing before a different arbitrator. CFA now petitions this court for a writ of mandate directing the superior court to vacate its order and to confirm the arbitration award.
 

 We will deny the writ petition and affirm the trial court’s order.
 

 
 *938
 
 Background
 

 In 1988, M. Rivka Polatnick (hereafter the grievant) was hired at San Jose State University (hereafter the University) as an assistant professor in the social science department. She was a probationary faculty employee, subject to periodic performance reviews for the purpose of retention. The normal probationary period was six years, after which time she would be considered and evaluated for tenure and promotion. A denial of tenure at the end of the six-year period would mean that she had no further reemployment rights. A grant of tenure would normally be accompanied by promotion to associate professor and would mean that she had the right to continued permanent employment at the University.
 

 The grievant’s letter of appointment in 1988 informed her generally of what was expected of her during her probationary period at the University: “The Social Science Department expect faculty members to demonstrate growth and accomplishment in academic, professional and scholarly activities reflected by student and collegial teaching evaluations, the presentation of conference papers, the preparation of manuscripts for publication and other research-related activities. These expectations supplement the more general statement of criteria and standards contained in the University and School of Social Sciences policies on appointment, tenure, retention and promotion.”
 

 The University’s criteria and standards were developed by the academic senate and are contained in a University policy document entitled “Appointment, Retention, Tenure, and Promotion Criteria, Standards, and Procedures for Regular Faculty Employees” (hereafter ARTP Policy). This document provides that “[ejxcellence in education is dependent above all upon the quality of the faculty. The purpose of these procedures for recruitment, retention, tenure and promotion is to provide just recognition and encouragement of genuine achievement. The basic evaluation of faculty members’ potential, performance and achievement should be made by their peers both within their department and their disciplines at large.”
 

 The University ARTP Policy sets forth the two “basic criteria” for evaluating a probationary faculty member: “effectiveness in academic assignment and scholarly or artistic or professional achievement.” Scholarly achievement refers in general to “work based on research and. entailing theory, analysis, interpretation, explanation or demonstration,” and includes “books, articles, reviews, technical reports, computer software ... or papers read to scholarly associations.” The ARTP Policy further describes the guidelines for evaluating a faculty member’s scholarly achievements: Such achieve
 
 *939
 
 ments “should be thoroughly evaluated by one’s disciplinary peers, within and/or outside one’s department, not merely enumerated. Acceptance of scholarly or artistic work by an editorial or review board (or jury) constitutes an evaluation of that work. Work in progress and unpublished work should be assessed whenever possible. When appropriate, professional contributions should be evaluated by professional persons in a position to assess the quality and significance of the contributions. Ordinarily the number or length of publications
 
 per se
 
 shall not be a criterion for tenure or promotion.”
 

 The ARTP Policy stresses that the decision regarding tenure is “perhaps the most important decision the university must make with respect to its faculty since, in effect, it represents a commitment on the part of the university which may entail three or four decades of service on the part of the faculty members. The granting of tenure is not solely a reward for services performed during the probationary years, but is an expression of confidence that a faculty member will continue to be a valued colleague, a good teacher and an active scholar, artist or leader in his or her profession. Accordingly, tenure decisions should be based upon thorough review of faculty members during their probationary years. . . . Tenure should be granted only to individuals whose record of teaching and contributions to their professional communities indicates the potential to earn promotion to the ranks of associate and full professor.” Because of its importance, “an award of tenure requires more than potential or promise.” It requires that the candidate have made professional contributions to the particular discipline, evidencing “both the commitment to and the potential for continued development and accomplishment throughout the candidate’s career.”
 

 The University ARTP Policy also sets forth the requirements for promotion to associate professor, which is the second highest academic rank. “The rank of associate professor presupposes that a faculty member has considerable academic or professional experience and accomplishments during the probationary period. ... In addition [to academic effectiveness], there should be evidence that scholarly or artistic or professional activity is a continuing part of a faculty member’s professional life. . . . [Promotion to associate professor . . . require [s] demonstrable achievement or contribution to the candidate’s discipline or professional community. Professional contributions should demonstrate the development of a candidate’s potential for leadership in his or her professional community, or other valuable contributions to the profession. Similarly, a candidate’s scholarly or artistic achievements should exhibit qualities of intellectual, artistic or professional competence and the promise of continuing development and growth on the part of the faculty member.”
 

 The University president has the ultimate authority to make tenure and promotion decisions. Such decisions, however, must be based upon information and documentation contained in the faculty member’s personnel file,
 
 *940
 
 including recommendations from three separate retention and tenure committees—a department-level committee consisting of six tenured faculty, a college-level committee consisting of a representative from each of nine departments, and a university-level committee consisting of a representative from each of nine colleges—as well as from the dean of the college and the associate academic vice-president for faculty affairs. Only tenured full-time faculty and academic administrators may engage in deliberations and make recommendations to the president regarding the evaluation of a probationary faculty member. Each participant in this peer review process “must be thoroughly trained in the use of the present university policy on Appointment, Retention, Tenure, and Promotion Criteria, Standards, and Procedures for Regular Faculty Employees. Department chairs, college deans, and the Associate Academic Vice President for Faculty Affairs shall arrange for appropriate training in the application of this policy.” At all levels of review, the probationary faculty member is to be given a copy of the recommendations and may submit a rebuttal or response and/or request a meeting to discuss the recommendation.
 

 Pursuant to ARTP Policy standards and procedures, the grievant in this case was evaluated for retention during every year of her six-year probationary period, with the exception of one year. During the academic year 1994-1995, she was evaluated for tenure and promotion. The evaluation process produced 721 pages of materials, which comprised her dossier, or personnel file. Her reviewers were divided on their recommendations. With respect to the evaluations for tenure, the vice president, seven members of the university committee, two members of the college committee and five members of the department committee recommended granting tenure. Two members of the university committee, five members of the college committee, one member of the department committee and the dean voted against granting tenure. With respect to promotion, the votes were similar except that the college committee voted one in favor of promotion and six opposed.
 

 Robert Caret, the university president, reviewed the documentation and recommendations and decided against granting tenure and promotion. In a letter to the grievant dated May 26, 1995, he wrote: “After reviewing the recommendations of your peers, the appropriate administrators and the record set forth in your 1994-1995 dossier, I have decided that the University will not continue your employment beyond May 31, 1996. [^] This decision was made after considering your record and the evaluations of all reviewers. This assessment shows that you have not met the criteria for tenure at the rank of Assistant Professor at San Jose State University. While you have achieved a record of effectiveness in academic assignment, your record [of] scholarly productivity is meager and does not express confidence
 
 *941
 
 that you will continue to be an active scholar in your profession. Given this evidence, I have decided that 1995-1996 will be your terminal year.”
 

 Polatnick filed a grievance in accordance with the procedures provided in the collective bargaining agreement (hereafter the agreement) between CSU and CFA. The agreement provides first for an informal dispute resolution process, which is mandatory. This involves a certain period of time during which the grievant presents a written claim and may request a meeting with the president, at which the grievant has the right to representation by the CFA. If the claim is thereafter denied, the president must provide a written response, stating the reasons for denying it. In this case, no resolution was reached during this informal period and the grievant then requested arbitration, pursuant to article 10.7 of the agreement. The arbitration was conducted on April 30, 1996 and May 14, 1996.
 

 Article 10.18 of the collective bargaining agreement describes the arbitration procedure. Subdivisions (d), (e) and (f) specifically delineate the authority of the arbitrator respecting tenure and promotion disputes. Since the limits of the arbitrator’s authority are at the heart of the issue before us, we set forth these paragraphs in full:
 

 “10.18
 
 Arbitration
 

 “(d) The arbitrator’s award shall be based solely upon the evidence and arguments appropriately presented by the parties in the hearing and upon any post-hearing briefs.
 

 “(e) The arbitrator shall have no authority to add to, subtract from, modify or amend the provisions of this Agreement.
 

 “(f) The authority of an arbitrator with respect to granting appointment, reappointment, promotion or tenure shall be as follows:
 

 “In cases involving appointment, reappointment, promotion or tenure, the arbitrator shall recognize the importance of the decision not only to the individual in terms of his/her livelihood, but also the importance of the decision to the institution involved.
 

 “The arbitrator shall not find that an error in procedure will overturn an appointment, reappointment, promotion, or tenure decision on the basis that proper procedure has not been followed unless:
 

 “1. there is clear and convincing evidence of a procedural error; and
 

 
 *942
 
 “2. that such error was prejudicial to the decision with respect to the grievant.
 

 “The normal remedy for such a procedural error will be to remand the case to the decision level where the error occurred for reevaluation, with the arbitrator having authority in his/her judgment to retain jurisdiction.
 

 “An arbitrator shall not grant appointment, reappointment, promotion or tenure except in extreme cases where it is found that:
 

 “1. the final campus decision was not based on reasoned judgment;
 

 “2. but for that, it can be stated with certainty that appointment, reappointment, promotion or tenure would have been granted; and
 

 “3. no other alternative except that remedy has been demonstrated by the evidence as a practicable remedy available to resolve the issue.
 

 “The arbitrator shall make specific findings in his/her decision as to the foregoing.
 

 “In the event the CSU seeks to vacate an arbitration award in the manner prescribed by the California Code of Civil Procedure, the court may, among the other matters it considers, determine whether or not the arbitrator has exceeded his/her authority with respect to the foregoing.”
 

 Consistent with these provisions of the collective bargaining agreement, CSU and CFA stipulated that the issue submitted to the arbitrator was: “[D]id [the university president] engage in reasoned judgment in denying tenure and promotion to [the grievant]? If not, what is the appropriate remedy?” The parties agreed that the grievant bore the burden of showing conclusively that the university president did not engage in reasoned judgment and that she was entitled to tenure and promotion.
 

 After hearing testimony from a number of witnesses, including the grievant herself, regarding her academic performance and scholarly achievement, the arbitrator concluded, in the language of the collective bargaining agreement, that “the final campus decision by [the university president] was not based on reasoned judgment; but for that, it can be stated with certainty that promotion and tenure would have been granted; there is no other alternative remedy available.” The arbitrator stated his reasons, finding that the evidence showed conclusively that the grievant was an excellent teacher and was effective in academic assignment. As to her scholarly productivity, the
 
 *943
 
 arbitrator disagreed with the university president’s assessment of the grievant’s achievements in this area and stated that he was persuaded by the witnesses who testified favorably upon the quality of the grievant’s scholarly performance. The arbitrator directed that the university president grant tenure to the grievant and promote her to the rank of associate professor, with full benefits. The decision, dated July 18, 1996, was made effective May 27, 1996.
 

 CSU filed a motion in superior court to vacate the arbitration award under Code of Civil Procedure section 1286.2, subdivision (d), on the ground that the arbitrator had exceeded his authority under the collective bargaining agreement by substituting his judgment for the president’s on the quality of the grievant’s scholarly achievements. CFA filed a motion to confirm the arbitrator’s award. Each party opposed the other’s motion.
 

 The superior court, in an order dated June 11, 1997, granted the motion to vacate the arbitration award and denied the motion to confirm. The court noted its limited scope of review and acknowledged that it was not the function of the court to rule on the correctness of either the arbitrator’s decision or the decision of the University president. The court found, however, that the arbitrator did not decide the question before him using the limited standards of review set forth in the collective bargaining agreement. The court therefore remanded the matter for another hearing before a new and different arbitrator.
 

 CFA filed a petition for a writ of mandate in this court, seeking to vacate the superior court’s order. We asked for opposition and then issued an alternative writ commanding the superior court to show cause why the relief sought should not be granted. Both parties have now responded to the order to show cause and the matter has been fully briefed and argued.
 

 Issues
 

 Standard of Review
 

 It is well settled that the scope of judicial review of arbitration awards is extremely narrow.
 
 (Moncharsh
 
 v.
 
 Heily & Blase
 
 (1992) 3 Cal.4th 1 [10 Cal.Rptr.2d 183, 832 P.2d 899] (Moncharsh);
 
 Advanced Micro Devices, Inc.
 
 v.
 
 Intel Corp.
 
 (1994) 9 Cal.4th 362 [36 Cal.Rptr.2d 581, 885 P.2d 994] (AMD).) Courts may not review either the merits of the controversy or the sufficiency of the evidence supporting the award.
 
 (Southern Cal. Rapid Transit Dist.
 
 v.
 
 United Transportation Union
 
 (1992) 5 Cal.App.4th 416, 422-423 [6 Cal.Rptr.2d 804].) Furthermore, with limited exceptions,
 
 *944
 
 “. . . an arbitrator’s decision is not generally reviewable for errors of fact or law, whether or not such error appears on the face of the award and causes substantial injustice to the parties.”
 
 (Moncharsh, supra,
 
 3 Cal.4th at p. 6; see also pp. 25-28.) These rules “vindicate[] the intentions of the parties that the award be final”
 
 {id.
 
 at p. 11) and support the “ ‘strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.’ ”
 
 (Id.
 
 at p. 9, quoting
 
 Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc.
 
 v.
 
 100 Oak Street
 
 (1983) 35 Cal.3d 312, 322 [197 Cal.Rptr. 581, 673 P.2d 251].)
 

 Consistent with this policy, the Legislature has specifically set forth, in Code of Civil Procedure section 1286.2, subdivisions (a) through (f), the
 
 only
 
 grounds which will justify vacating an arbitration award. Subdivision (d) is the relevant subdivision here. Under that subdivision, a court
 
 “shall”
 
 vacate the award if it determines that “[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted.” (Code Civ. Proc., § 1286.2, subd. (d).) In determining whether the arbitrators exceeded their powers, courts must give “substantial deference to the arbitrators’ own assessments of their contractual authority . . . .”
 
 (AMD, supra, 9
 
 Cal.4th at p. 373.) A deferential standard is in keeping with the general rule of arbitral finality and ensures that judicial intervention in the process is minimized.
 
 {Ibid.)
 
 “A rule of judicial review under which courts would independently redetermine the scope of an arbitration agreement already interpreted by the arbitrator would invite frequent and protracted judicial proceedings, contravening the parties’ expectations of finality.”
 
 (Ibid.)
 

 The Supreme Court recognized in both
 
 Moncharsh
 
 and
 
 AMD,
 
 however, that the parties must be free to fashion agreements which restrict or limit the arbitrator’s authority. “ ‘[T]he scope of arbitration is . . . a matter of agreement between the parties’ ”
 
 (Moncharsh, supra,
 
 3 Cal.4th at p. 8); “[t]he powers of an arbitrator derive from, and are limited by, the agreement to arbitrate.”
 
 (AMD, supra, 9
 
 Cal.4th at p. 375.) Thus although an arbitrator generally enjoys substantial discretion to determine the scope of his or her contractual authority, courts are bound to uphold the parties’ express agreement to restrict or limit that authority.
 
 (AMD, supra, 9
 
 Cal.4th at pp. 375-376.) Otherwise, arbitrators would possess the “ ‘unusual power’ ” of being able to determine their own jurisdiction and Code of Civil Procedure section 1286.2, subdivision (d), would be a nullity.
 
 (AMD, supra, 9
 
 Cal.4th at p. 375, quoting
 
 McCarroll
 
 v.
 
 L.A. County etc. Carpenters
 
 (1957) 49 Cal.2d 45, 65-66 [315 P.2d 322].) “[C]ourts retain the ultimate authority to overturn awards as beyond the arbitrator’s powers . . . .”
 
 (AMD, supra, 9
 
 Cal.4th at p. 375.)
 

 
 *945
 
 Guided by these standards, this court conducts a de novo review, independently of the trial court, of the question whether the arbitrator exceeded the authority granted him by the parties’ agreement to arbitrate.
 
 (Southern Cal. Rapid Transit Dist.
 
 v.
 
 United Transportation Union, supra,
 
 5 Cal.App.4th 416, 423;
 
 AMD, supra, 9
 
 Cal.4th at p. 375, fn. 9.)
 

 The Scope of the Arbitrator’s Authority in the Collective Bargaining Agreement
 

 At the outset it is important to recognize that the agreement in this case does not contain a standard arbitration clause, whereby the parties typically agree to arbitrate any or all disputes arising out of a particular contractual relationship. In
 
 AMD,
 
 for example, the contract provided for arbitration of “ ‘disagreements aris[ing] under this Agreement....’” and further provided that the arbitrator could “ ‘grant any remedy or relief which the Arbitrator deems just and equitable and within the scope of the agreement
 
 (AMD, supra, 9
 
 Cal.4th at p. 368.) In
 
 Moncharsh,
 
 the agreement provided that ‘“[a]ny dispute arising out of this Agreement shall be subject to arbitration . . . .”
 
 (Moncharsh, supra,
 
 3 Cal.4th at p. 7, fn. 1.) Similarly broad were the arbitration agreements in
 
 Marsch
 
 v.
 
 Williams
 
 (1994) 23 Cal.App.4th 238, 241, fn. 3 [28 Cal.Rptr.2d 402] (“Any dispute, controversy or claim arising out of, or relating to, this Agreement or any alleged breach thereof, shall be settled by binding arbitration . . . .”),
 
 Blue Cross of California
 
 v.
 
 Jones
 
 (1993) 19 Cal.App.4th 220, 224 [23 Cal.Rptr.2d 359] (“Any dispute between [the parties] must be submitted to binding arbitration . . . .”) and
 
 Pacific Gas & Electric Co.
 
 v.
 
 Superior Court
 
 (1993) 15 Cal.App.4th 576, 582 [19 Cal.Rptr.2d 295] (binding arbitration of the question of market price and of “any other dispute . . . arising . . . under any provision” of the contracts). In such cases, the parties agree to submit any dispute to the arbitrator for resolution, and grant the arbitrator broad powers to determine the scope of his or her authority, resolve the dispute and fashion a remedy.
 

 The agreement before us is quite different. Here the decision on tenure and promotion is not submitted to arbitration in the first instance. Instead, the arbitrator sits in a reviewing capacity. By the time a faculty status matter is submitted to arbitration, the University president will have reached a decision after a lengthy peer review process involving evaluations and recommendations from between 20 to 30 faculty members and administrators. And the grievant will have had the opportunity to participate in a mandatory review and resolution process within the University.
 

 The parties’ agreement regarding arbitration sets forth a detailed two-tiered scope of review regarding faculty status decisions, clearly reflecting
 
 *946
 
 an intent that the arbitrator have only limited authority in this area. (Art. 10.18, subd. (f).) The arbitrator is not empowered to decide, or even to redecide, the issue whether a particular candidate is worthy of tenure or promotion. Rather the arbitrator’s limited task is to review the decision-making process, under certain specific standards. If the arbitrator finds, by “clear and convincing evidence,” that there has been error in the procedure which was prejudicial to the grievant, the arbitrator is authorized to remand the case “to the decision level where the error occurred” so that the decision-makers can reevaluate and correct the error. (Art. 10.18, subd. (f).) Only in “extreme cases” is the arbitrator authorized to directly grant tenure or promotion. If the arbitrator takes this extreme measure, he or she must make three specific findings supporting that action. He or she must find that the decision made by the president regarding faculty status “was not based on reasoned judgment.” Second, the arbitrator must be able to state
 
 “with certainty”
 
 that, but for the lack of reasoned judgment, the candidate would have been granted tenure or promotion. Finally, the arbitrator must find that there was “no other . . . practicable remedy available to resolve the issue.” (Art. 10.18, subd. (f).)
 

 Acknowledging “the importance of the [faculty status] decision,” not only to the candidate but also to the University, the parties have chosen to treat such decisions differently from other areas of possible dispute arising from the agreement, as to which the arbitrator enjoys broader powers. Subdivision (i) of article 10.18 provides that “[t]he standard of review for the arbitrator in other than faculty status cases is whether the CSU violated, misapplied, or misinterpreted a specific term(s) of this Agreement.”
 

 Thus, unlike the arbitration agreements interpreted in the extensive body of case law on this subject, the parties here have taken pains to define the issue to be arbitrated and to specifically describe the limits of the arbitrator’s review authority and the available remedies. As a further safeguard, the parties have included a paragraph allowing for the possibility of judicial review of the arbitrator’s exercise of authority with respect to faculty status decisions. It provides that if the University seeks to vacate the award, the court may determine, among other things it considers, “whether or not the arbitrator has exceeded his/her authority . . . .” (Art. 10.18, subd. (f).)
 

 The limited review accorded tenure decisions by the parties’ arbitration agreement furthers the University ARTP Policy, which provides that such decisions be made only after a comprehensive peer review process to assess and evaluate a candidate’s professional qualifications and achievements. Furthermore, important public policy interests are served by restricting judicial, or as in this case arbitral, review of a University’s decisions
 
 *947
 
 regarding lifetime academic tenure. Such decisions, because they “ ‘comprehend discretionary academic determinations which . . . entail review of the intellectual work product of the candidate . . . [are] most effectively made within the university . . . .’ ”
 
 (Pomona College
 
 v.
 
 Superior Court
 
 (1996) 45 Cal.App.4th 1716, 1724-1725 [53 Cal.Rptr.2d 662], quoting
 
 Kunda
 
 v.
 
 Muhlenberg College
 
 (3d Cir. 1980) 621 F.2d 532, 547-548.) “ ‘[T]he peer review system has evolved as the most reliable method for assuring promotion of the candidates best qualified to serve the needs of the institution.’ ”
 
 (Id.
 
 at p. 548.)
 

 “ ‘Wherever the responsibility lies within the institution, it is clear that courts must be vigilant not to intrude into that determination, and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.’ [Citation.]
 

 “Such deference toward academic expertise is further warranted because the essential characteristic of tenure is continuity of service, in that the institution in which the teacher serves has relinquished the freedom or power it otherwise would possess to terminate the teacher’s service. [Citation.] This enormous commitment of subsidizing a qualified scholar’s research and teaching for the rest of his or her life is how a college or university ensures freedom of teaching and research and of extramural activities, and a sufficient degree of economic security to make the profession attractive to men and women of ability. Freedom and economic security, hence, tenure, are indispensable to the success of an educational institution in fulfilling its obligations to its students and to society. [Citation.]
 

 “These purposes of tenure can be fulfilled only if the individuals selected to receive tenure in fact possess the intellectual and personal qualifications to carry out the institutions’ essential missions of research and instruction. Those granted tenure define the intellectual character of the institution for decades after their selection. The determination each year of who should receive tenure thus has the potential either to greatly enrich the institution and its students or to jeopardize the institution’s very existence.
 

 “Only one group of people is suited to undertake the responsibility of making these decisions: the candidate’s academic peers who are knowledgeable about the candidate’s chosen field of study and about the particular needs of the institution. These peers, unlike nonacademics, are equipped to
 
 *948
 
 evaluate the candidate’s teaching and research according to their conformity with methodological principles agreed upon by the entire academic community. They also have the knowledge to meaningfully evaluate the candidate’s contributions within his or her particular field of study as well as the relevance of those contributions to the goals of the particular institution. Moreover, because their individual academic reputations are intertwined with that of the university, the candidate’s peers have the greatest stake in choosing people whose future work will reflect favorably on the institution. [¶] It is for these reasons that courts have been reluctant to review the merits of a tenure decision . . . .”
 
 (Pomona College
 
 v.
 
 Superior Court, supra,
 
 45 Cal.App.4th at pp. 1725-1726, fns. omitted.)
 

 Where the candidate’s personnel file, as is often the case, contains conflicting views of academic scholars, courts “cannot hope to master the academic field sufficiently to review the merits of such views and resolve the difference of scholarly opinion.”
 
 (Zahorik
 
 v.
 
 Cornell University
 
 (2d Cir. 1984) 729 F.2d 85, 93.) Courts have thus consistently reached the conclusion that “. . . universities should be ‘free to establish departmental priorities, to set their own required levels of academic potential and achievement and to act upon the good faith judgments of their departmental faculties or reviewing authorities.’ ”
 
 (Pomona College
 
 v.
 
 Superior Court, supra,
 
 45 Cal.App.4th at p. 1726, quoting
 
 Zahorik
 
 v.
 
 University, supra,
 
 729 F.2d at p. 94.)
 

 The United States Supreme Court has observed that it is essential to . academic freedom that a university be able to determine for itself on academic grounds who may teach.
 
 (Sweezy
 
 v.
 
 New Hampshire
 
 (1957) 354 U.S. 234, 263 [77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311]; see also
 
 Widmar
 
 v.
 
 Vincent
 
 (1981) 454 U.S. 263, 276 [102 S.Ct. 269, 277, 70 L.Ed.2d 440];
 
 University of California Regents
 
 v.
 
 Bakke
 
 (1978) 438 U.S. 265, 312 [98 S.Ct. 2733, 2759, 57 L.Ed.2d 750].) Submitting the merits of such determinations for de novo review by a nonacademic would severely impact this freedom, and was neither intended nor provided for by the parties here.
 

 The criteria and standards for evaluating a candidate for promotion or tenure are contained within the University ARTP Policy. These standards were developed by the academic senate and approved by the University president and are outside the scope of the collective bargaining agreement. The University policy statement acknowledges that the decision regarding tenure is “perhaps the most important decision the university must make with respect to its faculty since, in effect, it represents a commitment on the part of the university which may entail three or four decades of service . . . .” This decision is made only after a multilevel peer review process involving several committees formed for the specific purpose of evaluating
 
 *949
 
 candidates for tenure and comprised of tenured faculty members who have received training in the applicable criteria and standards. The ARTP Policy stresses that a candidate’s qualifications, particularly in the area of scholarly achievements, must be “thoroughly evaluated by one’s disciplinary peers, within and/or outside one’s department. . . .” Although the parties agree to submit a grievance regarding the eventual tenure decision to arbitration by a nonacademic, it' is clearly not for purposes of reevaluating whether the candidate is worthy of tenure and promotion, but simply to determine whether the decisionmaking process was flawed or the decision was not based on reason.
 

 Courts are not unfamiliar with such a standard of review, which is closely similar to the prejudicial abuse of discretion standard applied in administrative mandamus proceedings. (Code Civ. Proc., § 1094.5, subd. (b).) One court has recently described the abuse of discretion standard in the precise terms of the agreement here, observing that under such a standard a decision can be overturned “only if it was not based on a reasoned judgment.” (See, e.g.,
 
 Foothill Properties
 
 v.
 
 Lyon/Copley Corona Associates
 
 (1996) 46 Cal.App.4th 1542, 1557 [54 Cal.Rptr.2d 488].) Other courts have stated that under this standard a decision will be upheld unless it “exceeds the bounds of reason”
 
 (Denham
 
 v.
 
 Superior Court
 
 (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193]), or was exercised in an arbitrary, capricious or patently absurd manner, resulting in a manifest miscarriage of justice.
 
 {People
 
 v.
 
 Fudge
 
 (1994) 7 Cal.4th 1075, 1105 [31 Cal.Rptr.2d 321, 875 P.2d 36].) Such a deferential standard does not allow for a reviewing court, or arbitrator, to substitute his or her judgment for that of the decisionmaker.
 

 Two previous arbitration decisions involving CFA and CSU which interpreted the same arbitration clause in the parties’ agreement were part of the record below. Although they are not precedential authority, we find them instructive. In a decision from California State University, Northridge, the arbitrator wrote: “Clearly, the language [“reasoned judgment”] does not mean that the University’s determination to deny tenure is unassailable so long as it gives reasons for its action. If that were the case, there would be no purpose in having an arbitrator review the action, since in every case the University could undoubtedly state some reason to support denial of promotion or tenure. [¶] The parties have granted the arbitrator authority to judge the reasons that are proffered. But the negotiated language plainly contemplates that the parties did not intend to grant the arbitrator unfettered authority to redecide tenure and promotion decisions based on his or her own evaluation of the candidate’s record, as indicated by the restrictive language which states that an arbitrator cannot overturn denial of appointment, promotion, or tenure ‘except in extreme cases’ and only if ‘it can be said with
 
 *950
 
 certainty’ that tenure would have been granted but for the lapse of ‘reasoned judgment.’ ”
 

 “The question for the arbitrator is not which way she would have balanced the scale, had the decision been hers to make. Rather, the question is whether the decision made by those charged with making it was not reasoned.”
 
 [1]
 

 In another decision, from California State University, Long Beach, the arbitrator explained that “the ‘reasoned judgment’ criterion allows the University considerable discretionary authority in promotion and other faculty status matters. For an arbitrator to conclude that ‘reasoned judgment’ was not exercised in a particular case would normally require a strong showing, e.g., that the University’s decision was based on criteria different from those set forth in established policies; that criteria were applied in an arbitrary, inconsistent or discriminatory manner; that evidence strongly in the applicant’s favor was ignored; or that the decision-making process was demonstrably defective for some other concrete reason. The ‘reasoned judgment’ criterion gives an arbitrator the authority to protect faculty members against abuse of the University’s discretion; it does not permit the Arbitrator to substitute his judgment for that of the University just because he or someone else might have evaluated the case differently.”
 
 [2]
 

 Under University ARTP Policy the president’s decision regarding tenure or promotion amounts to an exercise of discretion, which must be based on an evaluation of numerous reviews and recommendations submitted by tenured faculty and administrators. The arbitrator’s task, as set forth in the agreement and supported by important policy considerations, is not to undertake an independent evaluation of the grievant’s performance and qualifications, but to determine whether the president’s decision was based on reason, or in other words whether it constituted an abuse of discretion.
 

 The Arbitrator’s Decision
 

 The arbitrator determined, and the parties do not disagree, that of the “Two Basic Criteria” to be considered in a faculty status decision, the focus in this case was on the grievant’s scholarly or professional achievement. Thus, the issue before the arbitrator can be narrowed to the question whether this was an “extreme case[]” where the president’s assessment that the grievant’s scholarly and professional achievement was insufficient to meet the criteria for tenure was “not based on reasoned judgment.”
 

 
 *951
 
 In this, we believe the arbitrator exceeded his authority. Although the arbitrator’s award recites the language of the agreement in finding that the campus decision was “not based on reasoned judgment,” the opinion itself clearly shows that the arbitrator disagreed with the president’s evaluation of the grievant’s scholarly achievement and substituted his own judgment for the president’s.
 

 Whereas the president had determined that the grievant’s “scholarly productivity [was] meager,” and also somewhat belated, and he stated that he did not feel confident she would continue to be an active scholar in her profession, the arbitrator expressed a different opinion. He wrote: “I cannot agree that [the grievant’s] scholarly productivity is ‘meager.’ Rather, I believe for an Assistant Professor with relatively few years of teaching and many burdens imposed upon her, her scholarly productivity is more than satisfactory under the standards for promotion and tenure.”
 
 [3]
 

 Furthermore, the arbitrator offered his own interpretation of University ARTP standards and criteria, which are matters outside the scope of the collective bargaining agreement. He expressed his view that the decision makers participating in the ARTP process had not evaluated the evidence properly: “This is another example of decision makers putting too much emphasis on the number of articles rather than the quality thereof.” He suggested that the reviewers “should read the articles, be well informed about the reputation of the publication and not be concerned whether the cover of the journal is hard or soft.”
 

 The arbitrator clearly misperceived the authority granted him to perform a limited deferential review of the president’s decision. He stated he believed he was in a
 
 better
 
 position than the president to evaluate the grievant’s performance because ARTP Policy provided that the president make his decision based upon an evaluation of the written information and documentation contained in the grievant’s personnel file. “I had an advantage which President Caret did not have,” wrote the arbitrator. “He was working primarily and deciding from what lawyers call a ‘cold record’; I heard the testimony and could form impressions of what witnesses knew and what they did not know about scholarship and other aspects of the Grievant’s service.” Thus the arbitrator based his decision in large part on evidence which the president could not have considered under ARTP Policy. The arbitrator weighed this evidence and wrote that he was “very impressed by the testimony of witnesses . . . who commented favorably upon all aspects
 
 *952
 
 of the Grievant’s performance including scholarship,” while he discounted the views of some of the faculty reviewers who had voted to deny tenure, finding it “obvious” that they had “little or no idea of what the Grievant has accomplished in her publications.”
 

 Finally, the arbitrator noted that he was impressed by the testimony of one committee member, who had not even been present when the recommendations were made regarding the grievant’s faculty status, but who testified that “had he not been absent when the Grievant’s case was heard, he would have been able to educate his fellow committee members on important aspects of the Grievant’s service and scholarly publications.”
 

 We believe these excerpts from the arbitrator’s opinion demonstrate precisely the kind of unwarranted interference with academic decisionmaking that the parties expressly sought to preclude. The arbitrator disregarded the clear intent of the parties as expressed in the restrictive language of the agreement describing a deferential review. Instead he undertook a reevaluation of the evidence, interpreted the applicable criteria and formed his own opinion regarding the grievant’s scholarly achievement. The award thus fails to conform to the specific limitations of the parties’ submission and intrudes on areas outside the scope of the arbitrator’s authority.
 

 We are well aware that the standard of review of arbitration awards discussed in
 
 Moncharsh, AMD,
 
 and the other cases in this area, generally prohibits courts from reviewing the validity of the arbitrator’s reasoning, including any mistake of fact or law, and likewise prohibits judicial review of the sufficiency of the evidence supporting the award. CFA argues that we are bound to uphold the award under
 
 Moncharsh
 
 and AMD even if it appears it was the product of a mistake or erroneous reasoning. That is not the issue here, however. This is not a case, as in
 
 Moncharsh,
 
 where the arbitrator merely reached an erroneous decision. Here the arbitrator failed to adhere to the specific restrictions and limitations imposed on him by the parties and engaged in a decisionmaking process which exceeded his authority. Thus, unlike
 
 Moncharsh,
 
 the arbitrator in this case “strayed beyond the scope of the parties’ agreement by resolving issues the parties did not agree to arbitrate.”
 
 (Moncharsh, supra,
 
 3 Cal.4th at p. 28.)
 

 Both
 
 Moncharsh
 
 and
 
 AMD
 
 repeatedly acknowledge exceptions to the general rules governing scope of review in cases where the parties have expressly restricted or limited the arbitrator’s powers. (See, e.g.,
 
 AMD, supra, 9
 
 Cal.4th at pp. 367, 381-382, 383;
 
 Moncharsh, supra,
 
 3 Cal.4th at pp. 8, 10, 11.) Indeed the central holding of
 
 AMD
 
 was that “in
 
 the absence of more specific restrictions in the arbitration agreement, the submission or the
 
 
 *953
 

 rules of arbitration,
 
 the remedy an arbitrator fashions does not exceed his or her powers if it bears a rational relationship to the underlying contract . . . .”
 
 (AMD, supra, 9
 
 Cal.4th at p. 367, italics added.) The
 
 AMD
 
 court cautioned that parties who intended that an arbitrator’s powers be restricted “would be well advised to set out such limitations explicitly and unambiguously in the arbitration clause.”
 
 (AMD, supra, 9
 
 Cal.4th at p. 383.)
 

 That is exactly what the parties did here. Their arbitration clause describes in some detail the limits on the arbitrator’s power of review with respect to faculty status decisions. Where there is such an express limitation on the arbitrator’s powers, the exceptions noted in
 
 Moncharsh
 
 and
 
 AMD
 
 come into play. As the court in
 
 AMD
 
 observed, it is difficult to see how the violation of an express and explicit restriction on the arbitrator’s powers could be considered “rationally related to a plausible interpretation of the agreement . . . .”
 
 (AMD, supra, 9
 
 Cal.4th at pp. 381-382.) Moreover, “[t]he arbitrator cannot shield his decision from scrutiny ‘simply by making the right noises—noises of contract interpretation . . . .’ [Citation.] Rather the question is whether the award is ‘so
 
 outré
 
 that we can infer that it was driven by a desire to do justice beyond the limits of the contract.’ ”
 
 (AMD, supra, 9
 
 Cal.4th at p, 380, quoting
 
 Ethyl Corp.
 
 v.
 
 United Steelworkers of America
 
 (7th Cir. 1985) 768 F.2d 180, 187.)
 

 The
 
 AMD
 
 court approved of the “essence” test set forth by the United States Supreme Court in
 
 Steelworkers
 
 v.
 
 Enterprise Corp.
 
 (1960) 363 U.S. 593 [80 S.Ct. 1358, 4 L.Ed.2d 1424]. There the court held: “[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator’s words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.”
 
 (Id.
 
 at p. 597 [80 S.Ct. at p. 1361].)
 

 We conclude the arbitrator in this case failed to conform to the specific restrictions of the parties’ agreement and engaged in a decisionmaking process outside the scope of his authority. In such a case a reviewing court
 
 must
 
 vacate the award on the ground the arbitrator has exceeded his or her powers. (Code Civ. Proc., § 1286.2, subd. (d).)
 

 Disposition
 

 The petition for a writ of mandate is denied. The trial court’s order vacating the arbitrator’s award and remanding the matter for another hearing
 
 *954
 
 before a new and different arbitrator is affirmed. Each party is to bear its own cost.
 

 Cottle, P. J., and Mihara, J., concurred.
 

 Petitioner’s application for review by the Supreme Court was denied July 22, 1998.
 

 [1]
 

 In the Matter of a Controversy Between CSU and CFA re Denial of Tenure of Dr. Carol Kovach (1992) No. 222-92-G3a.
 

 [2]
 

 In the Matter of a Controversy Between CFA and CSU, Involving the Grievance of Daniel Barber (1986) No. L85-933.
 

 [3]
 

 The grievant had one article accepted for publication in a recognized journal in her field, in December of 1994, her tenure decision year, and also had authored an article which had been published in a book.