[No. H019017. Sixth Dist. Dec. 29, 1999.]

CITY OF PALO ALTO, Plaintiff and Appellant, v.
SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 715 et al.,
Defendants and Respondents.

COUNSEL

Ariel Pierre Calonne, City Attorney, William B. Mayfield and Susan W. Case, Assistant City Attorneys; Whitmore, Johnson & Bolanos, Richard S. Whitmore, Jack W. Hughes and Eileen S. Dizon for Plaintiff and Appellant.

Van Bourg, Weinberg, Roger & Rosenfeld and W. Daniel Boone for Defendant and Respondent Service Employees International Union, Local 715.

Carroll, Burdick & McDonough and Christopher D. Burdick for Defendant and Respondent Danton Camm.

## OPINION

**ELIA, J.**—The City of Palo Alto (City) appeals from an order confirming an arbitration award in favor of Danton Camm, a former city employee, and denying the City's petition to vacate the award. Camm was fired from the City's utilities department for threatening to shoot another employee, Brian Bingham, and the members of his family. The arbitrator ordered that Camm be reinstated to his former position.

On appeal, the City argues that the trial court erred by failing to vacate the arbitration award because (1) California has a paramount public policy requiring employers to provide a safe workplace by terminating employees who make threats to the lives of coworkers and reinstatement violates that policy, and (2) the award conflicts with a court-ordered injunction against Camm, which was issued pursuant to Code of Civil Procedure section 527.8. Camm and the union representing him, Service Employees International Union, Local 715, both argue that the arbitration award does not contravene any public policy. Camm also asserts that the arbitration award does not require the City to violate any term of the injunction since it can assign him other tasks at other locations not specified in the injunction or put him on paid administrative leave.

We find that the arbitration award violated the public policy requiring obedience to court orders and reverse the trial court's order confirming the award.

### A. *Background*

The evidence adduced at the arbitration hearing showed the following. Camm began working for the City in 1983 and eventually became a lead

worker, who supervised a work crew, in the water, gas, and wastewater operations section of the City's utilities department. Camm is an avid hunter and previously had gone hunting with Bingham. Camm admitted that he once unintentionally brought a pistol, which he used for hunting, in his car to work.

Camm commonly threatened those working with him with physical violence if they did not perform but it seemed to be considered just talk. Camm acknowledged that he told people in the department, who knew that he was a single man, that the job was all he had and he had nothing to lose. Camm had threatened to shoot Bingham and others before the February incident and the threats were considered jokes and were not taken seriously. Camm had told people at work, including Bingham, that he could kill a man at 600 yards. Camm's personalized license plate says "SHOOOT." In February 1997, he owned 18 rifles and pistols and had scopes on almost all of his rifles.[1]

Prior to making the February threat leading to his termination, Camm had been reprimanded for threatening a supervisor who had bumped a side mirror of Camm's parked car. He had also been disciplined by two days' suspension without pay and six months' removal from standby for his offensive reaction to another driver while driving a City vehicle.

About a month before the incident leading to his termination, Camm had requested that Bingham, who had been a member of his crew for years, be transferred off his crew because of poor performance.

About February 19, 1997, Bingham informed Camm that he had complained to a supervisor about Camm. During the ensuing exchange, Camm threatened to shoot Bingham, his wife and their new baby if he lost his job. Bingham later tape-recorded a conversation with Camm during which he attempted to get Camm to repeat the threat.

According to Camm, the police arrested him for making a terrorist threat (Pen. Code, § 422) and he spent March 20 through March 28 in jail, but he later entered a plea to disturbing the peace and the criminal charge was dropped.

On April 11, 1997, the City, on behalf of Bingham, obtained an injunction against Camm pursuant to Code of Civil Procedure section 527.8 and the arbitrator was aware of this order. The injunction provided, among other

---

[1]Camm stated at the arbitration hearing that he had given all his guns to the Palo Alto Police Department but had asked for them to be returned.

things, that Camm must not make any contact with Bingham and that Camm must stay at least 100 yards away from Bingham, Bingham's residence, Bingham's place of work, Bingham's children's school or place of child care, and the City's "Utility Department—Water/Wastewater/Gas Division work crew sites." The order was made effective until April 11, 2000. Intentional violation of an injunction granted under Civil Procedure section 527.8 is a crime. (Code Civ. Proc., § 527.8, subd. (j); Pen. Code, § 273.6.)

The City terminated Camm effective April 25, 1997. Camm appealed from that disciplinary action. The parties submitted the issue to binding arbitration pursuant to the memorandum of understanding between Service Employees International Union, Local 715 and the City.

In his statement of decision, the arbitrator recognized the danger of workplace violence and the reality that the City had already experienced a fatal incident of workplace violence in 1988. He acknowledged that these problems required employers to "take all reasonable means to protect their employees and the public" from workplace violence.

Nevertheless, the arbitrator concluded: "[T]he expeditious action on the part of the City to separate the grievant from his work environment resulted in violating his right to appropriate notice, his right to union representation and his right to a full and fair investigation. The action of removing Camm from his livelihood without his right to the basic appeal process provided for City employees covered by the Memorandum of Understanding between the City and Union justifies, on its face, that the appeal of Danton Camm be granted."

In addition, the arbitrator found the City's termination unsupportable on the merits. The arbitrator questioned Bingham's motivation in attempting to goad Camm into making incriminating statements while covertly taping him and in seeking more severe disciplinary action against Camm since Camm had reported his dissatisfaction with Bingham's work to a supervisor and asked Bingham to be taken off his crew. More importantly, it was the arbitrator's opinion that the threats were "taken out of context of what was common workplace language at the work site." He stated: "The caustic and offensive language demonstrated to be part of the department's vernacular everyday 'boy talk' has long since passed as acceptable communication. It has clearly been demonstrated that what may not be understood as threats between two employees at the work site, may well be perceived as real and alarming by those who are outside that environment."

The arbitrator recognized that the City's workplace violence policy was to provide a " 'safe work environment that is free of violence and the threat of

violence.' " He observed that, according to the City's workplace violence policy, "an employee of the City who threatens violent behavior is subject to criminal prosecution and/or disciplinary action, including termination." However, he stated that the City's workplace violence policy had to be uniformly enforced and impliedly found that the City had not evenhandedly enforced its policy.

By decision dated March 12, 1998, the arbitrator reduced the termination to a written warning, ordered Camm reinstated to his former position as "leadman," and awarded backpay.

The City petitioned to vacate the arbitration decision on the grounds that it violated "the express legislated public policy of the State of California requiring employer intervention against threats of violence and it commands an illegal act." The Union cross-petitioned to confirm the arbitration decision.

The trial court found that (1) there was no express public policy requiring employer intervention against threats of violence by an employee, and (2) the arbitration award "neither supplants nor modifies [the injunction obtained by the City against Camm] nor would the City's compliance with the Award necessarily require the City to violate any terms or condition[s] of the preliminary injunction." However, the court stated: "This Court does not make any judgment on how or whether the City can comply with the injunction and reinstate Danton Camm to his job."

## B. *Review of Private Arbitration Awards*

 "It is well settled that the scope of judicial review of arbitration awards is extremely narrow. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1 . . . ; *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362 . . . .) Courts may not review either the merits of the controversy or the sufficiency of the evidence supporting the award. (*Southern Cal. Rapid Transit Dist. v. United Transportation Union* (1992) 5 Cal.App.4th 416, 422-423 . . . .) Furthermore, with limited exceptions, '. . . an arbitrator's decision is not generally reviewable for errors of fact˚or law, whether or not such error appears on the face of the award and causes substantial injustice to the parties.' (*Moncharsh, supra,* 3 Cal.4th at p. 6; see also pp. 25-28.)" (*California Faculty Assn. v. Superior Court* (1998) 63 Cal.App.4th 935, 943-944 [75 Cal.Rptr.2d 1].)

Judicial review of private arbitration awards is ordinarily limited to the statutory grounds for vacating an award (Code Civ. Proc., § 1286.2) and

correcting an award (Code Civ. Proc., § 1286.6.) (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 28, 33 [10 Cal.Rptr.2d 183, 832 P.2d 899].) Those statutory provisions permit a court to vacate or correct an award that exceeds the arbitrator's powers. (Code Civ. Proc., §§ 1286.2, subd. (d), 1286.6, subd. (b).)

The normal rule of limited judicial review cannot be avoided except in those rare cases where "according finality to the arbitrator's decision would be incompatible with the protection of a statutory right" or where the award contravenes "an explicit legislative expression of public policy." (*Moncharsh v. Heily & Blase, supra*, 3 Cal.4th at pp. 32-33; cf. *Board of Education v. Round Valley Teachers Assn.* (1996) 13 Cal.4th 269 [52 Cal.Rptr.2d 115, 914 P.2d 193]; cf. also *Evans Products Co. v. Millmen's Union No. 550* (1984) 159 Cal.App.3d 815, 820 [205 Cal.Rptr. 731] [arbitrator's award compelling employer to contravene child labor provisions of Fair Labor Standards Act was not enforceable on ground of illegality].) "Absent a clear expression of illegality or public policy undermining this strong presumption in favor of private arbitration, an arbitral award should ordinarily stand immune from judicial scrutiny." (*Moncharsh v. Heily & Blase, supra*, 3 Cal.4th at p. 32.)

## C. Public Policy

### 1. Workplace Safety

■■■ The City argues that the arbitration award in this case violated the clear public policy requiring employers to provide employees with a safe workplace. The City asserts that it "would not fulfill its obligation to provide a safe workplace if it speculated about whether Camm really meant to carry out his threat and failed to fire him in the hope that he would not really do it." It further maintains that "[s]ince public policy required the City to terminate Camm when it learned of his threat, the same policy prohibited the arbitrator from reinstating him."

The City asserts that the statutory provisions contained in Labor Code section 6400 et seq., which concerns the responsibilities and duties of employers regarding safety in employment, establish the public policy. The City also points to Code of Civil Procedure section 527.8, which provides employers with a remedy to address unlawful violence or credible threats of violence by an employee against a coworker in the workplace.

Labor Code section 6400 provides: "Every employer shall furnish employment and a place of employment which are safe and healthful for the employees therein." Labor Code section 6401 states: "Every employer shall

furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful. Every employer shall do every other thing reasonably necessary to protect the life, safety, and health of employees." Labor Code section 6402 provides: "No employer shall require, or permit any employee to go or be in any employment or place of employment which is not safe and healthful."[2] Labor Code section 6401.7 requires in part: "(a) Every employer shall establish, implement, and maintain an effective injury prevention program. The program . . . shall include, but not be limited to, the following elements: [¶] . . . [¶] (3) The employer's methods and procedures for correcting unsafe or unhealthy conditions and work practices in a timely manner. [¶] . . . [¶] (6) The employer's system for ensuring that employees comply with safe and healthy work practices, which may include disciplinary action."[3] (See Cal. Code Regs., tit. 8, § 3203 [injury and illness prevention program].)

While Labor Code section 6400 et seq. focuses on occupational injury and illness and makes no specific mention of workplace violence or threats of violence, those provisions clearly make it an employer's legal responsibility to provide a safe place of employment for their employees. CalOSHA (California Occupational Safety and Health Act) considers risks of workplace violence to be a workplace safety issue, which must be addressed in an employee's injury prevention program. (See Cal. Dept. of Industrial Relations, Division of Occupational Safety and Health, CalOSHA Guidelines for Workplace Security (Mar. 30, 1995) pp. 12-14; Cal. Dept. of Industrial Relations, Division of Occupational Safety and Health, Model Injury & Illness Prevention Program for Workplace Security (Mar. 1995).)[4] It

---

[2]Although not cited by the City, Labor Code sections 6403 and 6404 also relate to employee safety. Labor Code section 6403 states: "No employer shall fail or neglect to do any of the following: [¶] (a) To provide and use safety devices and safeguards reasonably adequate to render the employment and place of employment safe. [¶] (b) To adopt and use methods and processes reasonably adequate to render the employment and place of employment safe. [¶] (c) To do every other thing reasonably necessary to protect the life, safety, and health of employees." Labor Code 6404 declares: "No employer shall occupy or maintain any place of employment that is not safe and healthful."

[3]The City also cites California Code of Regulations, title 8, section 3203, which requires employers to implement injury and illness prevention programs. This regulation is aimed at eliminating unsafe conditions and work practices and workplace hazards through a systemic program of training, education, communication, investigation, inspection, and compliance oversight. No specific mention is made of workplace violence or threats of violence in the regulations.

[4]Copies of the CalOSHA Guidelines for Workplace Security, as revised March 30, 1995, and March 1995 Model Injury & Illness Prevention Program for Workplace Security were

appears that one component of such program must be a compliance system, including disciplinary actions, to ensure safe and healthy work practices. (Cal. Code Regs., tit. 8, § 3203, subd. (a)(1); see Lab. Code, § 6401.7, subd. (a)(6); see Cal. Dept. of Industrial Relations, Div. of Occupational Safety and Health, Model Injury & Illness Prevention Program for Workplace Security, *supra*, at p. 7.)

Code of Civil Procedure section 527.8, which was added by the "Workplace Violence Safety Act" (Stats. 1994, 1st Ex. Sess. 1993-1994, ch. 29, § 1, No. 8 West's Adv. Legis. Service, p. 3015), specifically addresses potential workplace violence. That section was "intended to provide optional remedies which supplement rather than replace existing remedies against workplace violence, and does not obligate an employer to seek those optional remedies." (*Ibid.*)

Code of Civil Procedure section 527.8 empowers an employer on behalf of an affected employee to obtain a temporary restraining order and an injunction against any individual, including another current employee, who engaged in unlawful violence or made a credible threat of violence at the workplace.[5] Where the person engaging in the alleged workplace violence or credible threats of violence is a current employee, the judge must receive evidence concerning the employer's decision to retain, terminate, or otherwise discipline the person. (Code Civ. Proc., § 527.8, subd. (f).) "If the judge finds by clear and convincing evidence that the defendant engaged in unlawful violence or made a credible threat of violence, an injunction shall issue prohibiting further unlawful violence or threats of violence" by that individual. (*Ibid.*) The injunction may be made effective for a period of up to three years and is renewable. (*Ibid.*) Intentional disobedience of any temporary restraining order or injunction issued pursuant to this section is punishable as a crime. (Code Civ. Proc., § 527.8, subd. (j); Pen. Code, § 273.6.)

We agree that these provisions taken together express an explicit public policy requiring employers to take reasonable steps to provide a safe and

---

filed in support of the City's petition to vacate the arbitration award. The Model Injury & Illness Prevention Program for Workplace Security was again revised in August 1995. This court takes judicial notice of these publications. (Evid. Code, §§ 452, subd. (c), 459.)

[5] A "credible threat of violence" is now defined as "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no [immediate] legitimate purpose." (Code Civ. Proc., § 527.8, subd. (b)(2).) At the time the injunction against Camm was obtained, a "credible threat of violence" was a threat intended to cause, and actually causing, a person to believe that he or she was under threat of death or serious bodily injury as well. (Stats. 1994, 1st Ex. Sess. 1993-1994, ch. 29, § 2.)

secure workplace. ██ Such responsibility appears to include the duty to adequately address potential workplace violence.[6] However, the City has not established that the public policy entails the obligation to automatically fire any employee who makes a threat of violence regardless of the employee's intent in uttering it and the actual risk to workplace safety and regardless of the procedural guarantees secured by collective bargaining and set forth in a memorandum of understanding between a union and a city. While a city might be required to summarily place an employee on administrative leave to fulfill its duty of providing a safe workplace where the city has reasonable proof that an employee has made a credible threat of violence against a coworker, nothing permits a city to entirely ignore the grievance procedures to which it agreed when following them does not compromise workplace safety. Likewise, reinstatement of an employee, who had no intention of carrying out his or her threats of violence, is not necessarily precluded because there is no absolute public policy against employment of persons who make threats of violence, which operates regardless whether there is an actual risk of violence.

Here, the arbitrator found that Camm's threat, while it was violative of the City's workplace violence policy, reflected the type of aggressive language commonly used and tolerated in the utilities department.[7] The arbitrator implicitly concluded that Camm did not intend to carry out his threat against Bingham and his family and the threat was just tough talk.

Nevertheless, the City appears to suggest that an arbitrator can never lawfully reinstate any employee who makes such a threat of violence. To the extent that the City's argument may be that Camm's threats were genuine, this was a disputed issue of fact involving conflicting evidence, which we cannot judicially revisit. A different result might well obtain if the arbitrator had found, or there was uncontroverted evidence, that Camm's threats were

---

[6]An agency's interpretation of the meaning and legal effect of a statute, which is reflected in something other than quasi-legislative regulations promulgated pursuant to express statutory authority, is entitled to consideration and respect by the courts if merited. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) However, the courts have the final responsibility for interpreting any statute. (*Id.* at pp. 7, 12.)

[7]At the hearing on the parties' petitions, the trial court stated: "[O]bviously the arbitrator, it seems to me, did find that these statements or threats were not, did not carry the import that they seem to on the face. . . . I gather from my reviewing of the case that I'm bound by his determination in that regard. That is certainly troubling, but I feel I'm compelled to accept his determination of the facts."

genuine[8] or if the arbitrator failed to reach that substantive question. There is an argument to be made that reinstatement of an employee—who made threats of violence, on purely procedural grounds, violates the public policy requiring an employer to provide a safe working environment. (Cf., e.g. *Exxon Shipping Co. v. Exxon Seamen's Union* (3d Cir. 1993) 993 F.2d 357, 364 [arbitrator's reinstatement of oil tanker seaman who tested positive for drugs after ship ran aground violated public policy against the operation of a vessel while under the influence]; *Stroehmann Bakeries v. Local 776* (3d Cir. 1992) 969 F.2d 1436, 1438, 1442 [arbitrator's reinstatement of employee without determining merits of sexual harassment allegation violated public policy against sexual harassment in the workplace]; *Newsday v. Long Island Typographical Union* (2d Cir. 1990) 915 F.2d 840, 845 [arbitrator's reinstatement of employee on procedural grounds although found to have committed sexual harassment violated public policy against sexual harassment in the workplace]; *Delta Air Lines v. Air Line Pilots Ass'n, Intern.* (11th Cir. 1988) 861 F.2d 665, 671-675 [arbitrator's reinstatement of commercial airline pilot who flew passenger plane while drunk violated public policy against operating civil aircraft while under the influence of alcohol].)

However, the City has not shown that reinstatement of Camm is necessarily incompatible with the public policy requiring employers to provide a safe workplace. We are gravely aware of the risks of workplace violence and the need for employers to take adequate action. We, therefore, emphasize that nothing in our decision is intended to prevent the City from closely monitoring and quickly responding to belligerent, intimidating, or threatening behavior, which might indicate a propensity to resort to physical violence, strictly enforcing its workplace violence policy across the board, and taking corrective measures to prevent the incident from recurring or escalating.

### 2. Obedience to Court Order

■ Although this court has determined that reinstatement did not violate the public policy requiring employers to provide a safe workplace by adequately addressing threats of violence, a different public policy conflict is presented by the injunction against Camm issued pursuant to Code of Civil Procedure section 527.8. ■ As the United States Supreme Court has observed, "[i]t is beyond question that obedience to judicial orders is an important public policy. An injunction issued by a court acting within its jurisdiction must be obeyed until the injunction is vacated or withdrawn.

---

[8]We need not here decide whether and under what circumstances a court could conclude, contrary to an arbitrator's finding, that reinstatement would pose a significant risk of violence and contravene the public policy requiring an employer to provide a safe workplace.

[Citations.]" (*W. R. Grace & Co. v. Rubber Workers* (1983) 461 U.S. 757, 766 [103 S.Ct. 2177, 2184-2184, 76 L.Ed.2d 298].)

Under California's general contempt law, "[d]isobedience of any lawful judgment, order, or process of the court" is punishable as a civil contempt. (Code Civ. Proc., § 1209, subd. (a)5.) A civil contempt may be punished by a fine or imprisonment or both (Code Civ. Proc., § 1218) or, under appropriate circumstances, performance may be compelled by indefinite imprisonment (Code Civ. Proc., § 1219). "Willful disobedience of any process or order lawfully issued by any court" also constitutes a criminal contempt, which is punishable as a misdemeanor. (Pen. Code, § 166, subd. (a)(4); see Pen. Code, § 19.) Enforcement of certain protective-type orders issued by the courts, including an order issued pursuant to Code of Civil Procedure section 527.8, is considered even more important, as witnessed by the more stringent punishment available for a criminal contempt of such orders. (See Pen. Code, § 273.6; see also Pen. Code, § 166, subd. (c).)

Although the arbitrator's award of reinstatement was directed at the City, not Camm, and, therefore, does not literally compel Camm to violate the injunction against him, Camm certainly could not have returned to his former position without violating the April 11, 1997, injunction. That order prohibited Camm from going to Bingham's place of work, which was Camm's place of work, and from going to all work crew sites of the water/wastewater/gas division of the Palo Alto Utilities Department. Camm's suggestions that the City might put him on paid administrative leave or place him in a different position not entailing any responsibilities that would require him to violate the injunction, even if feasible, are inconsistent with the arbitrator's order, which requires the City to reinstate Camm to his former position as "leadman" of a work crew in the utilities department.

It is and has been the City's position that the award cannot be enforced without violating the court's order. In explaining its decision to confirm the award, the trial court stated: "[M]y determination on this issue in no way, shape or form is intended to in any way imply what Judge Johnson or any other judge hearing the injunction or the restraining order should decide in that case . . . and that I'm not making any determination as to whether that's appropriate to continue an injunction in effect."

We see no way that the arbitrator's award reinstating Camm could have been put into operation without Camm disobeying the April 11, 1997, injunction. Thus, the arbitration award of unconditional reinstatement was

irreconcilable with the public policy requiring obedience to court orders, especially an injunction issued pursuant to Code of Civil Procedure section 527.8.[9] The conflict was all the more profound since the injunction was based upon a judicial finding by clear and convincing evidence that Camm had made a credible threat of violence against Bingham. (Code Civ. Proc., § 527.8, subd. (f).)

The order confirming the arbitration award and denying the petition to vacate the award is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion. The respondents are to bear costs on appeal.

Cottle, P. J., and Premo, J., concurred.

---

[9]We have taken judicial notice that on June 21, 1999, over two years after the original injunction issued and over one year after the arbitration award, the trial court modified the injunctive order by deleting Bingham's place of work and the work crew sites of the water/wastewater/gas division of the Palo Alto Utilities Department from its stay-away order (Evid. Code, §§ 452, 459). Upon remand, the trial court may consider the legal effect, if any, of the subsequent modification of the April 11, 1997, injunction against Camm.