[No. B223366. Second Dist., Div. Eight. Apr. 27, 2011.]

HRAYR SHAHINIAN et al., Plaintiffs and Respondents, v.
CEDARS-SINAI MEDICAL CENTER et al., Defendants and Appellants.

COUNSEL

Hill, Farrer & Burrill, Raymond W. Thomas, Suzanne J. Holland, Warren J. Higgins; Greines, Martin, Stein & Richland, Robin Meadow, Robert A. Olson, Jeffrey E. Raskin and Michael A. Brown for Defendants and Appellants.

Baker, Keener & Nahra, Robert C. Baker, Phillip A. Baker, R. Jeffrey Neer and Daniel P. Leonard for Plaintiffs and Respondents.

OPINION

GRIMES, J.—

### SUMMARY

The trial court granted a petition by Hrayr Shahinian (plaintiff or Shahinian), a physician then on the medical staff at defendant Cedars-Sinai Medical Center, to confirm an arbitration award in his favor. The arbitrator awarded plaintiff $508,124 in economic damages, $1,603,650 in emotional distress damages, and $2.58 million in punitive damages. The award also was deemed a voluntary withdrawal by plaintiff of medical staff membership and privileges at Cedars-Sinai.

Defendant appeals, claiming the award violated public policy and therefore exceeded the arbitrator's powers. Defendant asserts that, because the arbitrator found that defendant summarily suspended and substantially restricted plaintiff's clinical privileges without affording him a fair hearing, public policy required the arbitrator to order defendant to conduct a peer review hearing, rather than award damages against defendant. The arbitrator also

exceeded her powers, defendant claims, by applying a "strictly mechanical" doubling formula to determine the amount of emotional distress damages, and by awarding punitive damages in an amount that "exceeded both contractual and public policy limits."

We find no merit in defendant's contentions and affirm the judgment.

## FACTS

The facts adduced during the extensive hearings in this case are fully set out in the arbitrator's 128-page final award. We draw the facts necessary to an understanding of the issues on appeal from that award.

Plaintiff came to Cedars-Sinai in 1996, after being heavily recruited by Dr. Achilles Demetriou, then defendant's chairman, to relocate his Skull Base Institute from New York to Los Angeles, where defendant would establish a division of skull base surgery to be directed by plaintiff. Plaintiff trained for years to become a skull base surgeon, and Demetriou described plaintiff as "one of the best surgeons technically he [had] ever met." Plaintiff is board certified in surgery, but not in neurosurgery. The recruitment of plaintiff and the establishment of the skull base division met with tremendous resistance from neurosurgeons and others, who perceived plaintiff as a threat. Some considered plaintiff insufficiently qualified to be on defendant's medical staff.

The controversy continued throughout plaintiff's tenure. According to Dr. Demetriou, plaintiff "alienated everyone in the management structure." In August 2002, Shahinian's counsel raised issues with defendant's CEO concerning lack of support and resources for the skull base division, characterizing these issues as threatening to compromise patient care. But when told not to perform any surgery unless there was no compromise to patient care, plaintiff said there was no immediate threat. In September 2002, defendant notified Shahinian his professional services relationship with defendant (his services as a faculty physician and as director of the Skull Base Institute) would be terminated in September 2003.

In December 2002, plaintiff reiterated his concern that diminishing resources supplied to the institute had impaired the ability to perform procedures "with the utmost safety to the patient," and protested the "lack of or the malfunctioning of instruments." While plaintiff was provided with an appropriate number of sets of instruments when he came to Cedars-Sinai in 1996,

with increased numbers of procedures and the passage of time, an insufficient "redundancy" of instruments developed.

Plaintiff repeatedly questioned the adequacy of cleaning and sterilization processes at Cedars-Sinai, and had reasonable basis to do so. Plaintiff's instruments, which were extremely delicate, were routinely flash-sterilized after the first surgery of the day, a process that is "not advisable as a matter of convenience or due to insufficient redundancy of instruments."

In April 2003, prompted by plaintiff's concerns, members of defendant's staff investigated the status of plaintiff's specialized surgical instruments and found they had not been properly maintained or cleaned, and "bioburden" was found on some instruments.[1] It was defendant's responsibility to clean and maintain the instruments. Defendant's review of plaintiff's instruments indicated they had been "overused"; the arbitrator found this overuse and the absence of sufficient redundancy continued through December 2005.

After the termination of his faculty relationship with defendant and the disputes over the insufficiency of instruments and inadequate cleaning and sterilizing procedures, plaintiff drafted a civil complaint in October 2003. He alleged claims for tortious discharge in violation of public policy and other "representative" claims on behalf of the general public. This complaint was resolved in a settlement agreement in June 2005, under which the current dispute was submitted to arbitration.

In the settlement, the parties agreed, among other things, that certain named individuals would not disparage plaintiff, and that, "while Shahinian's medical staff privileges are governed exclusively by the Medical Staff Bylaws (including without limitation the Medical Staff Constitution and Rules and Regulations) and Departmental procedures [Cedars-Sinai] agrees that any issues regarding Shahinian's current medical staff privileges will be handled in a non-discriminatory manner on the same terms and conditions as other medical staff members." Defendant agreed not to "retaliate or discriminate against Dr. Shahinian in any unlawful manner with respect to his continued status as a medical staff member, including matters concerning his medical staff privileges . . . ."

The parties also agreed that the medical instruments listed on exhibit A to the settlement would be made available by defendant to plaintiff during his

---

[1] According to plaintiff, "bioburden" is "brain tissue cooked onto his instruments" by the sterilization procedure.

scheduled surgeries "on the same terms and conditions as other medical staff members," and, except for instruments designated as "custom," defendant would maintain, repair and replace the instruments. As for "custom" instruments, defendant had no obligation to maintain, repair or replace them. Shahinian agreed that, "prior to performing a surgery at [Cedars-Sinai], he [would] inspect all medical instruments he intends to utilize in such surgery, including without limitation, non-standard and/or 'custom' instruments, to ensure that they are appropriate to assure patient safety," and that "if any instrument's use is in Dr. Shahinian's judgment inappropriate to assure patient safety, he will cease using such instrument." Defendant paid plaintiff $200,000 and plaintiff released all claims.

After the June 2005 settlement, disputes between the parties continued unabated.

Shahinian manifested "either an apparent lack of understanding as to or, more likely, a refusal to acknowledge, what 'custom' meant in Exhibit A to the [settlement agreement], how instruments became so designated, and the ramifications of such designation. Shahinian testified that his attorneys told him to sign the agreement and 'they would work it out.'" After the settlement, plaintiff did not purchase any "custom" instruments for use at Cedars-Sinai, and neither did defendant.

In November 2005, plaintiff indicated to defendant that replacements were needed for the Stryker Leibinger bipolar forceps (SLBF), and defendant responded that the SLBF was a "custom" instrument. Later in November, plaintiff raised issues with the functioning of the EndoScrub, also listed as a "custom" instrument (though it was also used by other surgeons).[2] Shahinian claimed defendant was not honoring its obligations under exhibit A, "that every day trays are deficient and '[Shahinian's] struggling in the [operating room],' 'patients were suffering,' 'liability was increasing,' and [Shahinian] mentioned the [redacted] incident involving lack of proper backup." Plaintiff told defendant that if he were involved in a lawsuit against the facility, he would "tell the truth about the instruments" and how unsafe it was "due to him not having what he needs to do his procedures."

Thereafter, defendant, through Dr. William Brien, the interim chairman of its department of surgery, sent plaintiff a series of three letters, which are at the heart of the parties' dispute.

---

[2] The arbitrator observed: "The SLBF are included as a 'custom' item in Exhibit A to the [settlement agreement]. A number of instruments utilized by other surgeons, such as the EndoScrub and Leibinger osteotome and ring curettes, are also designated as 'custom,' as also is the Mitaka arm which was utilized by [another surgeon] (along with the EndoScrub) after [defendant's] unlawful interference with Shahinian's privileges."

*The December 8, 2005 letter*

In the first letter, on December 8, 2005, Dr. Brien imposed a 90-day moratorium on plaintiff performing surgery at Cedars-Sinai. Brien recited plaintiff's complaints about the SLBF, other instruments missing from his trays, the functioning of the EndoScrub system, and so on. He stated that an "initial internal investigation" had been conducted as a result of "the magnitude of [plaintiff's] concerns." Brien stated Cedars-Sinai was "committed to working with [plaintiff] to establish a workable and satisfactory methodology to address" plaintiff's concerns, and that it would take defendant 90 days, using outside experts, to establish the methodology. During that time, "because you believe that the conditions under which you operate . . . are not safe, you must not perform any surgery at the Medical Center. Unless and until both you and the Medical Center are convinced that such a methodology assuring the safety of our patients has been established, the Medical Center has determined that all of your surgeries at the Medical Center must be deferred."

Plaintiff viewed the December 8, 2005 letter as "catastrophic" and "decapitat[ing] his career," as it prevented him from continuing his work and he had no privileges elsewhere.

*The December 15, 2005 letter*

In a followup letter a week later, written after plaintiff requested defendant to allow five previously scheduled surgeries to go forward despite the moratorium, Dr. Brien agreed to permit the five surgeries, under specified conditions. The conditions included that plaintiff would provide defendant, no later than noon the following day, two complete, brand-new sets of the custom instruments necessary for the surgeries, for cleaning and sterilizing. Plaintiff was also required to make his employee (Nurse Araksi Bekhloyan) available to personally clean plaintiff's instruments prior to defendant's sterilization of the instruments; Bekhloyan would be required to execute a certification that she had cleaned the instruments to her satisfaction.[3] Plaintiff was further required to inspect all medical instruments (whether or not provided by plaintiff) and ensure that they were appropriate to ensure patient safety, completing a checkoff sheet documenting his approval. The December 15 letter reiterated that plaintiff could not perform any other surgeries during the 90-day moratorium, during which "the equipment and instruments which you use for performing skull based surgery and about which you have raised safety issues have been taken out of service with respect to your own use and

---

[3] The arbitrator noted that it is generally recognized in the industry that "instruments improperly cleaned *cannot* be properly sterilized . . . ."

with respect to use by any other physician until both you and the Medical Center are convinced that a methodology assuring the safety of our patients has been established."

Plaintiff did not perform the five surgeries at Cedars-Sinai, instead obtaining emergency privileges at Brotman Medical Center, which had expressed interest in recruiting him during discussions the previous summer.

*The March 15, 2006 letter*

Dr. Brien sent a further letter on March 15, 2006, advising plaintiff that, based on the analysis it received from the outside experts it had engaged, plaintiff could again perform surgeries, if he elected to do so, subject to specified conditions. These included: (1) Plaintiff could not use the SLBF, since the current design of those forceps was "not durable enough to assure against complications";[4] (2) plaintiff had to provide at least three sets of his surgical instruments; (3) if he permitted defendant to clean his instruments, plaintiff was "agreeing that the Medical Center's processes for cleaning the instruments are satisfactory," and if he chose not to permit defendant to clean the instruments, he had to make his employee Nurse Bekhloyan or another acceptable person available to personally clean the instruments and execute a certification about the cleanliness level prior to each surgery; (4) when a patient of plaintiff's was anesthetized at his direction, defendant would "deem these actions as affirming that [plaintiff had] checked [his] surgical instrument trays . . . . and that [plaintiff was] satisfied with the content and the quality of the instruments and equipment made available"; and (5) plaintiff had to comply with the settlement agreement.

In correspondence on May 5, 2006, with Dr. Brien, plaintiff "protest[ed] the actions of the three letters being taken without benefit of fair hearing process." In December 2006, plaintiff sued defendant, and defendant's motion to compel arbitration was granted in March 2007.

The first amended complaint in the arbitration asserted causes of action for intentional and negligent interference with economic relations, conversion, fraud, breach of contract, breach of the covenant of good faith and fair dealing, and injunctive relief.[5] Among other things, plaintiff alleged that defendant was aware of contractual relationships existing between plaintiff

---

[4] Plaintiff had used the SLBF at Cedars-Sinai "continuously over 10 years in thousands of surgical procedures . . . ."

[5] Plaintiffs in the arbitration were Shahinian and Skull Base Medical Group, Inc., and defendants were Cedars-Sinai Medical Center, the Medical Staff of Cedars-Sinai Medical Center, and Dr. Brien. For sake of simplicity, we refer to plaintiffs and defendants in the singular. The arbitrator found no liability on Brien's part.

and scheduled patients, and interfered with those relationships by willfully and maliciously taking Shahinian's clinical privileges at Cedars-Sinai, retaliating against him for voicing concerns about the clean and sanitary conditions of surgical instruments, imposing arbitrary conditions on his performing surgery at Cedars-Sinai, and discriminatorily permitting other physicians to use instruments without the limiting conditions imposed on plaintiff. In his claim for injunctive relief, plaintiff alleged that defendant failed to afford him the fair hearing procedures guaranteed to staff members whose clinical privileges are summarily suspended. Plaintiff sought compensatory and punitive damages, as well as an injunction preventing defendant from suspending his surgical privileges "or otherwise harassing anyone concerning their business relationship" with plaintiff.

After 24 days of hearings, the issuance of two preliminary decisions, and multiple rounds of briefing and supplemental briefing, the arbitrator issued a final award in favor of plaintiff in November 2009. Among the many findings of the arbitrator were these:

1. "[T]he 'moratorium' was not based on concerns about hospital practices but, rather, was based on concern about *Shahinian*'s practices, as evidenced by the fact that he was the only one affected by the 'moratorium,' only his instruments were 'sequestered,' and only his practices were subjected to ECRI review." (ECRI Institute was the outside expert defendant engaged.)[6]

2. Defendant "failed to adduce any testimony to contest abundant record evidence that the three letters were unique and unprecedented and [defendant] failed to provide an expert witness on industry custom and practice to testify that [defendant's] conduct vis a vis Shahinian was not totally anomalous." (Italics omitted.)

3. Shahinian's complaints about inadequate cleaning and sterilization protocols and practices and insufficient redundancy of instruments comprised "protected activity" as a matter of public policy, and the restrictions implemented by the three letters were retaliatory against Shahinian. "To respond to such complaints . . . by suspending privileges or by requiring, as a condition to exercise of privileges, a waiver of objection to inadequacy of cleaning/sterilization protocols and processes and an 'instrument inspection'

---

[6] The arbitrator found the ECRI investigation was "bogus," observing that ECRI had notified defendant that it did not perceive itself to be qualified for the anticipated assignment; its findings "were not independent, but, rather, tailored to ECRI's perception of [defendant's] designs in tendering the assignment"; "[o]bvious components of neutral inquiry . . . were overlooked"; and "the foreseeable result of [defendant's] concealment of relevant facts [from ECRI] was to disable [the investigator] from proffering constructive solutions going forward, as [defendant] ostensibly desired him to do."

which was impossible to perform in the intra- or peri-operative setting, comprised an unlawful, retaliatory, deprivation of privileges."

4. Defendant breached the settlement agreement, which required it to handle plaintiff's medical privileges in a nondiscriminatory manner (and also breached the associated covenant of good faith and fair dealing), by its retaliatory deprivation of plaintiff's medical privileges without peer review or fair hearing procedures.

5. The December 8, 2005 letter constituted a suspension of clinical privileges for medical disciplinary cause or reason within the meaning of Business and Professions Code section 805.[7] The "impetus to the restriction was not any bona fide doubt on the part of [defendant] as to [defendant's] processes, but rather, admittedly because Shahinian complained about patient safety concerns and potential associated liabilities and because of doubt as to the safety of Shahinian's processes and procedures, the soundness of his clinical judgments, and his qualifications to perform the surgeries he had been performing at [Cedars-Sinai] the previous 10 years."[8] (Italics & underscoring omitted.)

6. The instrument inspection condition imposed by the letters "is one which [defendant's] own expert . . . testified was 'impracticable for any surgeon to do . . . within any reasonable degree of time frame intraoperatively [or perioperatively] [and] would be a serious impediment to the . . . procedure.' "

7. The requirement in Dr. Brien's letters that plaintiff supply his own employee to clean his custom instruments and execute a certification (or be deemed to have agreed that defendant's processes for cleaning the instruments were satisfactory) was a "conditioning of privileges on terms and conditions different than those applicable to other staff members" and did not appear "to be designed to promote patient safety but rather to 'exculpate' [defendant] and shift blame to Shahinian in the event of an adverse event."

---

[7] Business and Professions Code section 805 defines "peer review" and related reporting requirements to state licensing agencies. It defines " '[m]edical disciplinary cause or reason' " to mean "that aspect of a licentiate's competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care." (§ 805, subd. (a)(6).)

[8] The arbitrator also noted that the ECRI report upon which defendant relied in its March 15, 2006 letter recommended redundancy of three sets for all specialized surgical instruments, but defendant "apparently considers that redundancy of specialized instruments is not required, except in the case of Shahinian, inasmuch as, following receipt of the ECRI report, [defendant] required a minimum of 3 sets of custom instruments for Shahinian, while continuing to allow other surgeons to continue to operate with only a single set of specialized surgical instruments."

8. The arbitrator rejected any contention that plaintiff's failure to exhaust internal administrative remedies, or to seek a writ of mandate, barred his breach of contract and interference claims that were based on the wrongful deprivation of privileges without peer review or fair process. The arbitrator pointed out that exhaustion would not be required because of defendant's denial of any such remedy; because resort to that remedy would be futile; and because the settlement agreement imposed the requirement to arbitrate "any dispute" arising out of the agreement. The arbitrator noted that defendant had "unequivocally adopted the position that its internal rules provided no fair hearing recourse for Shahinian relative to [defendant's] actions via the three letters."

9. Defendant's "restrictions/deprivation of Shahinian's clinical privileges without the fair process to which he was entitled comprises 'wrongful conduct' for purposes of establishing a claim for intentional (or negligent) interference with economic relations." Defendant "knowingly and intentionally interfered with Shahinian's medical practice, both his relationships with scheduled patients and also his prospective ability to practice his profession . . . ."

The arbitrator awarded plaintiff $508,124 in economic damages on his claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional and negligent interference with economic relations; $1,603,650 in emotional distress damages on the interference claims; and $2.58 million in punitive damages. The award also was deemed a "voluntary withdrawal, revocation and abandonment" by plaintiff of medical staff membership and privileges at Cedars-Sinai and precluded any future application for privileges until 2016.[9]

The trial court denied defendant's petition to vacate the arbitration award and granted plaintiff's petition to confirm the award. Judgment was entered in favor of plaintiff and this appeal followed.

## DISCUSSION

■ The principles governing review of an arbitration award are well established. An arbitration award is final and conclusive because the parties—as here—"have agreed that it be so." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10 [10 Cal.Rptr.2d 183, 832 P.2d 899], italics omitted (*Moncharsh*).) Only limited judicial review is available; courts may not review the merits of the controversy, the validity of the arbitrator's reasoning, or the sufficiency of the evidence supporting the award. (*Id.* at p. 11.) Thus, with "narrow exceptions," an arbitrator's decision is not reviewable for errors

---

[9] Plaintiff withdrew his claim for injunctive relief during the postarbitration briefing.

of fact or law. (*Ibid.*) This is so even if the error appears on the face of the award and causes substantial injustice. (*Id.* at p. 6.)

The grounds for vacating an arbitration award are stated in Code of Civil Procedure section 1286.2. One of those grounds—the ground asserted here—requires the court to vacate an arbitration award if the court determines that the arbitrator "exceeded [her] powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (§ 1286.2, subd. (a)(4).)

An arbitrator exceeds her powers if (among other things) she issues an award that violates a well-defined public policy, or that violates a statutory right, or that provides a remedy not authorized by law, or that imposes a remedy that is not rationally related to the contract. (*Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443 [123 Cal.Rptr.2d 122], citing cases (*Jordan*).)

Defendant contends the arbitrator exceeded her powers when she assessed emotional distress damages by doubling the economic damages, an approach defendant says was "arbitrary" and did not "weigh[] the evidence and apply[] reasoned judgment." In addition, defendant argues the award violates public policy by "circumventing the peer review hearing process" and by "violat-[ing] the constitutionally-imposed public policy limits on punitive damage awards." None of defendant's contentions has merit.

### 1. *The Emotional Distress Damages*

Defendant asserts the award of emotional distress damages was "arbitrary" and was based on a "mechanical formula" of "double the economic dam-ages," rather than on the evidence. This claim finds its roots in two preliminary decisions issued by the arbitrator (each followed by rounds of supplemental briefing). The first assessed economic damages at $1.78 million and emotional distress damages at $3.56 million and the second assessed economic damages at $407,231 and emotional distress damages at $814,462; the final award was $508,124 and $1.6 million, respectively. Defendant claims the award of emotional distress damages "fluctuated wildly" and must be vacated, because the arithmetic errors and computational issues that produced changes in the economic damages did not change "the degree of Dr. Shahinian's anxiety, grief, or humiliation."[10] Indeed, defendant claims it "does not matter that the ultimate result may be supported by the record,"

---

[10] This position contrasts with defendant's position in briefing following the arbitrator's second preliminary decision, in which defendant maintained that "[c]ertainly, a lower amount of economic harm reduces the effect of any alleged interference with [plaintiff's] practice, as well as the alleged financial stress associated with [defendant's] alleged conduct."

because "[t]he issue is one of process" and defendant is entitled to a reasoned judgment. (Italics omitted.)

Defendant effectively asks us to ignore the most basic principles governing judicial review of an arbitration award. We have no authority to review the reasoning by which the arbitrator reached the conclusions she reached (*Moncharsh, supra*, 3 Cal.4th at p. 11), and that includes the amount of emotional distress damages to be awarded. The claim that there was *no* reasoning—that doubling the economic damages was not a "reasoned judgment"—is simply defendant's opinion. In fact, the arbitrator thoroughly discussed her findings on noneconomic damages, including the reasons why she calculated those damages at two times plaintiff's economic damages.[11] Defendant may be unhappy with the result, but defendant agreed to "final and binding" arbitration, and that is what it got. ■ (See *ibid.* [parties who agree to arbitration " ' "may expect not only to reap the advantages that flow from the use of that nontechnical, summary procedure, but also to find themselves bound by an award reached by paths neither marked nor traceable and not subject to judicial review" ' "].)[12]

### 2. *The Public Policy Claim—Peer Review*

In its briefing to the arbitrator, defendant consistently maintained there was "absolutely no merit whatsoever" to the contention that the decisions contained in Dr. Brien's three letters should have been presented to the medical staff as part of the peer review process. Defendant's position throughout the arbitration was that the 90-day moratorium and the conditions subsequently imposed on plaintiff's exercise of staff privileges did not implicate plaintiff's competence or performance. Defendant insisted it only meant to respond to plaintiff's claim that defendant failed to meet its obligations with respect to instrumentation and equipment. Thus, defendant maintained, "no action taken by Cedars-Sinai was based upon Shahinian's competence or conduct."

---

[11] Defendant contends the lack of "reasoned judgment" also "can be framed in other ways," and asserts that by "mechanically and arbitrarily" doubling the economic damage amount, the arbitrator failed to decide the issue submitted. This contention has no support in fact or law.

[12] Defendant also argues this basis for vacating the award (lack of reasoned judgment) may be framed in yet another way; it cites *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362 [36 Cal.Rptr.2d 581, 885 P.2d 994] for the proposition that the remedy imposed by the arbitrator "must be related in a rational manner to the breach (as expressly or impliedly found by the arbitrator)." (*Id.* at p. 381.) But as that case also tells us, "[t]he award is rationally related to the breach if it is aimed at compensating for, or alleviating the effects of, the breach." (*Id.* at p. 381, fn. 12.) That is clearly the case here, where the arbitrator found that the manner in which plaintiff was deprived of his privileges, "summarily, without notice of true reason, with a pretextual investigation represented to be something other than what it actually was, and admittedly with no regard for Shahinian's interests and with insufficient regard for the interests of his patients, and other aspects discussed hereinabove, exacerbated the emotional distress."

The arbitrator concluded otherwise, finding (as described more fully above) that the 90-day moratorium was based on concern about plaintiff's practices, "as evidenced by the fact that he was the only one affected by the 'moratorium,' only his instruments were 'sequestered,' and only his practices were subjected to ECRI review" (which the arbitrator elsewhere described as "bogus"). Now, defendant contends that, because the arbitrator found the restrictions imposed on plaintiff were in fact based on defendant's concerns about his competence, the arbitrator's only option was to award plaintiff a peer review hearing (or to decide the question of his competence herself). An award of damages, defendant contends, exceeds the arbitrator's powers because it violates California's public policy "of ensuring patient safety through peer review evaluation and reporting of medical disciplinary charges," which is the "unwaivable process for determining issues of physician competence and professional conduct related to termination of staff privileges."

■ But plaintiff was *not* charged with incompetence or professional misconduct, and there was *no* recommendation from a peer review body to restrict or revoke his hospital privileges, so the question of waiver—which refers to waiver of statutory notice and hearing provisions where the physician is the subject of a final proposed action of a peer review body (Bus. & Prof. Code, § 809.6)—does not arise in this case. Nothing in the peer review statutes suggests that, when a physician and a hospital agree to arbitrate disputes unrelated to medical disciplinary charges, and the arbitrator concludes the hospital had concerns about the physician's competence, the arbitrator is thereupon stripped of her authority to award damages and must instead order a peer review hearing. Nor could the arbitrator decide the physician's competence herself when there has been no agreement to submit the physician's professional competence to the arbitrator for decision.

■ We recognize it is the state's policy to protect the health and safety of California citizens by excluding, through the peer review process, physicians who provide substandard care. The Legislature has declared that, "[t]o protect the health and welfare of the people of California," it is the state's policy "to exclude, through the peer review mechanism . . . those healing arts practitioners who provide substandard care or who engage in professional misconduct . . . ." (Bus. & Prof. Code, § 809, subd. (a)(6).) The head of any peer review body and any licensed health care facility must file a report with the state licensing agency if, because of the action of a peer review body, restrictions are imposed on a physician's staff privileges for a medical disciplinary cause or reason. (Bus. & Prof. Code, § 805, subd. (b)(3).) A physician who is "the subject of a final proposed action of a peer review body" is entitled to written notice of the proposed action and that he has the

right to request a hearing on the final proposed action.[13] (Bus. & Prof. Code, § 809.1, subd. (a).) The notice and hearing rights provisions may not be waived, in any agreement between the doctor and the peer review body or health care entity, "for a final proposed action for which a report is required to be filed" with the state licensing agency under section 805. (Bus. & Prof. Code, § 809.6, subd. (c).)

◼ Our Supreme Court has recognized the importance of the peer review process to protect the health and welfare of the people of California, and to protect competent doctors from being barred from practice for arbitrary or discriminatory reasons. (*Mileikowsky v. West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259, 1267–1268 [91 Cal.Rptr.3d 516, 203 P.3d 1113].) Courts have consistently required that any dispute over a doctor's competence to continue practicing medicine be submitted for a peer review determination before the dispute may proceed in court. (See, e.g., *Lee v. Blue Shield of California* (2007) 154 Cal.App.4th 1369 [65 Cal.Rptr.3d 612] [doctor required to exhaust remedy of peer review process before filing lawsuit despite health care service plan's wrongful denial of physician's right to peer review and termination of peer review hearing].)

None of these rules of law or public policies is implicated when a hospital becomes embroiled in a dispute with a doctor that has nothing to do with the doctor's competence or the doctor's professional conduct that puts patient care and safety at risk. When the dispute arises from business aspects of the doctor and hospital's relationship, there is no need to submit the dispute to a panel of expert medical peers for determination. That is exactly what defendant argued to the arbitrator. Here, the parties had what the arbitrator described as a "dysfunctional relationship" arising from their inability to resolve plaintiff's concerns about the durability, redundancy and cleanliness of instruments. Theirs was not a dispute over plaintiff's competence or any claimed risk to patient care presented by his skills as a surgeon. This was a dispute over which party was obligated to buy, clean and sterilize delicate and costly custom instruments for use in skull surgeries and whether defendant damaged plaintiff by the positions it asserted during the course of their dispute.

Neither party asked the arbitrator to decide any question relating to plaintiff's competence to perform skull surgeries. The parties offered testimony and other evidence in the first phase of the arbitration over the course of 23 days between November 14, 2008, and March 13, 2009; they submitted posthearing briefs and oral argument in April 2009, after which, in May 2009,

---

[13] Under some circumstances, a peer review body may immediately suspend or restrict clinical privileges, so long as the physician is subsequently provided with notice and hearing rights. (Bus. & Prof. Code, § 809.5, subd. (a).)

the arbitrator requested supplemental briefing to address the question whether defendant was motivated in part by concerns about plaintiff's competence, a question neither party had asked the arbitrator to decide. By responding to the arbitrator's inquiry, the parties did not thereby implicitly agree to expand the scope of the arbitration to include the question of plaintiff's competence. At all times, the parties wanted the arbitrator to decide only whether plaintiff was damaged and, if so, in what amount, as a result of defendant's allegedly wrongful conduct. The arbitrator's findings that the hospital was motivated by concerns over plaintiff's competence do not unseat the foundation of the arbitral award because the parties agreed to arbitrate all disputes arising from their settlement agreement, and the validity of the arbitrator's reasoning is not subject to review.

■ The arbitrator exceeds her powers only if the award "violates a statutory right or otherwise violates a well-defined public policy." (*Department of Personnel Administration v. California Correctional Peace Officers Assn.* (2007) 152 Cal.App.4th 1193, 1195 [62 Cal.Rptr.3d 110] (*Department of Personnel Administration*).) No statutory right or public policy is implicated by enforcing the arbitrator's award of damages in favor of plaintiff since the parties neither waived the peer review process nor agreed to circumvent it by arbitrating a dispute over plaintiff's competence. Defendant argues the award here should be vacated because it violates the public policy that a doctor's competence must be determined in a peer review hearing, which cannot be waived in favor of arbitration. The authorities Cedars-Sinai relies upon simply do not apply here, because neither the Legislature nor the courts have declared any public policy mandating that business disputes between a doctor and hospital unrelated to the doctor's competence must be submitted to peer review hearing.[14] To the contrary, it

---

[14] The cases defendant cites vacating an arbitration award on public policy grounds are entirely different from the circumstances here. (See *Pearson Dental Supplies, Inc. v. Superior Court* (2010) 48 Cal.4th 665, 680 [108 Cal.Rptr.3d 171, 229 P.3d 83] (*Pearson*) ["when . . . an employee subject to a mandatory employment arbitration agreement is unable to obtain a hearing on the merits of his FEHA claims, or claims based on other unwaivable statutory rights, because of an arbitration award based on legal error [erroneously finding the claim time-barred], the trial court does not err in vacating the award"; arbitrator has exceeded his or her powers]; *Department of Personnel Administration, supra*, 152 Cal.App.4th at pp. 1195, 1203 [arbitrator who reformed a written collective bargaining memorandum of understanding, in a way that changed provisions previously approved by the Legislature, violated the Ralph C. Dills Act (Gov. Code, § 3512 et seq.) "and the important public policy of legislative oversight of employee contracts" and consequently exceeded her powers]; *Jordan, supra*, 100 Cal.App.4th at pp. 440, 445, 449, 451–452 [where a statute required that attorney fees in the settlement of a lawsuit against the state be determined by arbitration, and the state's maximum exposure ($18 million) was determined before arbitration by a trial court judgment, an arbitration award of $88 million, founded on an improper common fund theory, was "both against public policy and an unconstitutional gift of public funds"; "the prohibition against gifts of public funds is a clear public policy set forth in" the state Constitution]; *City of Palo*

would disserve the peer review process to require highly skilled medical professionals to divert precious resources to decide contract disputes that the courts and arbitral associations are meant to resolve.

 ■ In this case, the arbitrator's award did not conflict with any statutory mandate or judicial prohibition. This was not a mandatory arbitration agreement, with an award that prevented plaintiff from vindicating his statutory rights in any forum, as in *Pearson*, nor is it one of those "rare cases where 'according finality to the arbitrator's decision would be incompatible with the protection of a statutory right' or where the award contravenes 'an explicit legislative expression of public policy.' [Citations.]" (*Palo Alto, supra*, 77 Cal.App.4th at p. 334.) It is instead the usual case where the arbitral award "stand[s] immune from judicial scrutiny." (*Moncharsh, supra*, 3 Cal.4th at p. 32.)

### 3. *Punitive Damages*

The arbitrator awarded plaintiff $2.58 million in punitive damages, a sum that is just over 1.22 times the compensatory damages she awarded.[15] She devoted more than 20 pages of the award to discussion of the punitive damages issue, and analyzed all the factors relevant to an award of punitive damages as described by the high court in *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–419 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*). Among other things, the arbitrator concluded that defendant's conduct "displayed a disregard for health and safety of patients by not providing adequate redundancy of instruments for Shahinian's surgeries, notwithstanding repeated pleas for more instruments" both from plaintiff and from other staff working with him; that plaintiff was financially vulnerable because he held surgical privileges only at Cedars-Sinai and "summary suspension of privileges without opportunity for hearing would foreseeably inflict severe damage to his medical career"; that defendant's conduct involved a pattern and practice of actions taken to procure plaintiff's removal from Cedars-Sinai outside the auspices of peer review; and that defendant "engaged in a protracted course of deceitful conduct toward Shahinian, including misrepresentations as to the reasons for and nature of the alleged 'moratorium,' as well as the purposes and results of the allegedly independent but actually [Cedars-Sinai] legal department-controlled ECRI investigation."

---

*Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327, 338–340 [91 Cal.Rptr.2d 500] (*Palo Alto*) [arbitration award reinstating an employee who had threatened another employee, and who had been enjoined by court order from going to the other employee's place of work (which was also his own), was irreconcilable with the public policy requiring obedience to court orders].)

[15] This amount "comprises 2% of the $129 million remaining in [Cedars-Sinai's] unrestricted assets after deducting for the value of the land and buildings which belong to the 'community' [defendant] serves under its 501(c) (3) mission."

Nonetheless, defendant asserts the punitive damages award "violates the constitutionally-imposed public policy limits on punitive damage awards." We must review the award, defendant claims, for two reasons: because the arbitration agreement limited the arbitrator's powers to remedies that a court could award (and a court cannot award constitutionally excessive punitive damages), and because the award "conflicts with public policies underlying constitutional limits on punitive damages."

The arbitration agreement here provides (by incorporating American Arbitration Association rules) that the arbitrator "may grant any remedy or relief that would have been available to the parties had the matter been heard in court . . . ." Of course, this clearly allows an award of punitive damages, and defendant does not contend otherwise. Defendant's only quarrel is with the amount, which defendant describes as a "[c]onstitutionally excessive" amount that would never be allowed in court. Defendant likens the parties' agreement (that the arbitrator could grant any remedy available if the matter had been heard in court) to the agreement in *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044 [9 Cal.Rptr.3d 286] (*O'Flaherty*), which specified that the arbitrator " 'shall not have any power . . . to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law.' " (*Id.* at p. 1057.) In *O'Flaherty*, the arbitrator ordered the forfeiture of partners' capital accounts, but the forfeiture remedy was inconsistent with the partnership agreement and "specifically in contradiction to the partnership agreement provision that the arbitrator has no power to order a remedy prohibited by the agreement or not available in a court of law . . . ." (*Id.* at p. 1061.) Consequently, the arbitrator "in effect awarded 'a remedy expressly forbidden by the arbitration agreement,' " acting "in excess of his power and jurisdiction." (*Ibid.*, citation omitted.)

The arbitration agreement here is nothing like the one in *O'Flaherty*, where the remedy of forfeiture of capital accounts was prohibited both by the partnership agreement and by California partnership law. The arbitrator did not award a remedy "expressly forbidden by the arbitration agreement." (*Advanced Micro Devices, Inc. v. Intel Corp., supra*, 9 Cal.4th at p. 381.) Here, the agreement gave the arbitrator broad authority to grant remedies available in court, and made no reference to punitive damages or to any limitation on the amount of such an award. If the punitive damages award *was* excessive, the arbitrator's error would be no different from other errors of law, which are generally not reviewable "whether or not such error appears on the face of the award and causes substantial injustice to the parties." (*Moncharsh, supra*, 3 Cal.4th at p. 6.) Moreover, where the arbitrator has made a legal error " 'in either determining the appropriate law or applying it,' " the parties may obtain court review of the merits "only if the arbitration agreement *expressly provided* that the arbitrator's errors of law were reviewable in court." (*Baize v. Eastridge Companies, LLC* (2006) 142 Cal.App.4th

293, 301 [47 Cal.Rptr.3d 763], fn. omitted.) As the Supreme Court held in *Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1361 [82 Cal.Rptr.3d 229, 190 P.3d 586], "to take themselves out of the general rule that the merits of the award are not subject to judicial review, the parties must clearly agree that legal errors are an excess of arbitral authority that is reviewable by the courts." There was no such agreement here.

Next, defendant returns again to the claim that the award violates public policy, this time because the punitive damages awarded allegedly exceed constitutional limits. And indeed the due process clause of the Fourteenth Amendment to the federal Constitution *does* impose substantive limits on a *state*'s imposition of punitive damages, preventing "grossly excessive" awards. (*State Farm, supra*, 538 U.S. at pp. 416–417.) But this is not a case where the state, through its judicial system, has imposed a "grossly excessive" award of punitive damages that constitutes "an arbitrary deprivation of property." (*Id.* at p. 417.) This was a private arbitration that the parties voluntarily agreed would be "final and binding."

The point is clearly stated in *Rifkind & Sterling, Inc. v. Rifkind* (1994) 28 Cal.App.4th 1282 [33 Cal.Rptr.2d 828] (*Rifkind*). In *Rifkind*, the party against whom the arbitrator assessed punitive damages argued that the due process clause requires some measure of judicial review of the size of and basis for a punitive damages award; because no such review of a private arbitrator's award is available in California, the award could not lawfully be made without an express waiver of the right to judicial review. (*Id.* at p. 1288.) The court rejected this notion, observing that the "fundamental fallacy" in the argument was the premise that due process requires judicial review of private arbitral awards of punitive damages: "That clause applies only to state action. . . . [¶] The arbitration in this case, however, was not state action. It was a private proceeding, arranged by contract, without legal compulsion. . . . Before its confirmation, the resulting award possessed the legal status of a private contract. . . . Consequently, the arbitration and award themselves were not governed or constrained by due process, including its elements applicable to judicial proceedings to impose punitive damages."[16] (28 Cal.App.4th at p. 1291, citations omitted.)

---

[16] *Rifkind* also rejected the notion that judicial review is constitutionally mandated when confirmation of the arbitration award is sought (a proceeding that *does* constitute state action). The court pointed out that California's statutory procedures provide the safeguards traditionally required, namely notice and a hearing, and in addition provide for judicial review " 'in circumstances involving serious problems with the award itself, or with the fairness of the arbitration process.' [Citation.]" (*Rifkind, supra*, 28 Cal.App.4th at p. 1292.) The court further observed that only a limited degree of state action is involved in confirming an arbitration award: "The state does not impose the award, or mark out its criteria. It only allows the contracting contestants to secure enforcement of their own bargain." (*Ibid.*)

 Defendant says *Rifkind* has "little persuasive value" because it was decided before the California Supreme Court and Courts of Appeal "expand[ed] on" the principle of judicial review of the merits of an arbitral award on the ground of conflict with public policy, and because it predates high court decisions such as *State Farm* that imposed due process limits on punitive damages awards. Defendant is mistaken. First, *Moncharsh*, which predated *Rifkind*, expressly stated that there may be "limited and exceptional circumstances justifying judicial review of an arbitrator's decision," such as "those in which granting finality to an arbitrator's decision would be inconsistent with the protection of a party's statutory rights," but that "[w]ithout an explicit legislative expression of public policy, . . . courts should be reluctant to invalidate an arbitrator's award on this ground." (*Moncharsh, supra,* 3 Cal.4th at p. 32.) So, "public policy" grounds for reviewing an arbitration award clearly existed before *Rifkind* was decided. Second, the high court's decisions limiting punitive damages on due process grounds have no bearing on the principles discussed in *Rifkind.* Those decisions addressed the limits on a *state*'s discretion over the imposition of punitive damages (*State Farm, supra,* 538 U.S. at pp. 416–417), rather than "an arbitration award [that] is not a product of public law or state proceedings, but rather is a private arrangement, governed by rules of the parties' own making or selection." (*Rifkind, supra,* 28 Cal.App.4th at p. 1292.)

Finally, defendant maintains that "[i]t cannot be true that arbitrators have unlimited power to award punitive damages," and that "[a]t some point, an award is so arbitrary and so oppressive that it is both irrational and contravenes public policy." We find nothing in the award here suggests this is such a case. The ratio of punitive to compensatory damages is just over 1.22 to one. In *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686 [101 Cal.Rptr.3d 773, 219 P.3d 749], the court held that a one-to-one ratio was the federal constitutional limit, but that was "base[d] . . . on the specific facts of [the *Roby*] case." (*Roby,* at p. 719; see *Amerigraphics, Inc. v. Mercury Casualty Co.* (2010) 182 Cal.App.4th 1538, 1566 [107 Cal.Rptr.3d 307] [maximum award of punitive damages consistent with due process based on the facts was a 3.8-to-one ratio].) In short, every case depends on its facts, and we are not at liberty to review the facts underlying an arbitration award absent "limited and exceptional circumstances." (*Moncharsh, supra,* 3 Cal.4th at p. 32.) As we have seen, no such circumstances appear.

## DISPOSITION

The judgment is affirmed. Hrayr Shahinian is to recover his costs on appeal.

Bigelow, P. J., and Rubin, J., concurred.

A petition for a rehearing was denied May 18, 2011, and appellants' petition for review by the Supreme Court was denied August 17, 2011, S193760.