Filed 1/21/26 Victorville/Desert Springs v. Baronet & Co. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| VICTORVILLE/DESERT SPRINGS, L.P. et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> BARONET & CO., INC., <br><br> Defendant and Appellant. | B340398 <br><br> (Los Angeles County Super. Ct. No. 23TRCP00441) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gary Y. Tanaka, Judge.  Affirmed.

Procopio, Cory, Hargreaves & Savitch, Kendra J. Hall, Meg E. Dawson, Jeff S. Hood and Michelle J. Wells for Defendant and Appellant.

Cox, Castle & Nicholson, Edward F. Quigley and Cathy T. Moses for Plaintiffs and Respondents.

—————————————

Appellant Baronet & Co., Inc. appeals a trial court judgment confirming an arbitration award in favor of respondents Victorville/Desert Springs, L.P., and Affordable Multi-Family, LLC (the Partnerships).  Baronet contends the arbitrator erroneously failed to give preclusive effect to findings from a prior arbitration between the same parties, and in so doing exceeded her authority, requiring the trial court to vacate the arbitration award under Code of Civil Procedure section 1286.2, subdivision (a)(4).[1]  Even assuming—which we do without deciding the question—that it was a legal error for the arbitrator to not give res judicata effect to the finding of negligent misrepresentation from the prior arbitration, the trial court correctly found that such error is not a basis for vacating an arbitration award.  We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.      Overview**

Baronet and the Partnerships were business partners in three low-income housing projects, for our purposes here named Breezewood, Oakwood, and Victorville.[2]  At the time the original disputes between Baronet and the Partnerships arose, Baronet was acting as the general contractor for the projects, and the Partnerships—with certain other entities not relevant here—

---

[1] All further statutory references are to the Code of Civil Procedure.

[2] The Oakwood project is sometimes referred to in the record as the Moreno project or the One Moreno Valley project.

were the developers. After Baronet filed a number of lawsuits against the Partnerships, the parties (through their representatives) exchanged settlement offers, participated in a mediation in April 2012, and entered into a written settlement agreement. Baronet subsequently initiated three consecutive arbitrations to enforce the settlement agreement. As provided in the settlement agreement, the mediator served as the arbitrator in the first two arbitrations; in both instances, he found in favor of Baronet, awarding damages, interest, attorney fees, and costs. A new arbitrator was appointed for the third arbitration, and that new arbitrator ruled against Baronet on its claim for damages and also awarded attorney fees and costs to the Partnerships. Only the third arbitration award is at issue in the current appeal, but some limited detail about the settlement and all three arbitrations will illuminate our discussion of the legal issues on appeal.

## B.  Settlement Discussions, Mediation, and Settlement Agreement

After Baronet filed a number of lawsuits against the Partnerships, discussions regarding the Oakwood and Breezewood projects led to an exchange of settlement proposals and an April 2012 mediation with George Calkins of JAMS acting as mediator. These discussions involved Charles Ashley, acting as Baronet's principal representative, and Michael Costa, acting on behalf of the Partnerships.

In the context of settlement discussions, Ashley sought and received 15-year cash flow projections for each project. These projections are referred to as the Proformas. Costa directed

Tetrault, an employee of the Partnerships, to prepare the Proformas. They were prepared in less than 10 days using information available in mid-2011, and they were used to help settle the parties' disputes at a mediation in April 2012.

The parties held continued negotiations over settlement documentation language, including whether the Proformas would be part of the settlement agreement and how they would be characterized. Their negotiations resulted in a signed Mutual Release and Settlement Agreement (Settlement Agreement), effective April 26, 2012. Broadly stated, the Settlement Agreement provided that the Partnership would pay Baronet two lump sum payments of $1.5 million and $1 million, plus annual payments of surplus cash as anticipated based upon the Proformas. The Settlement Agreement describes the Proformas in paragraph 2(f) as follows: "Attached hereto as Exhibit A are three (3) spreadsheets setting forth each Partnership's good faith estimate of each Partnership's projected Cash Flow and Sale or Refinancing Proceeds through Year l5 of each project based upon information known or available to the Partnership as of March 7, 2012 (each a 'Pro Forma Cash Flow' and together the 'Pro Forma Cash Flows'). The Parties acknowledge that the Pro Forma Cash Flows are not a guarantee of actual amounts of Cash Flow distributions and/or Sale or Refinancing Proceeds to be paid to Baronet from year to year pursuant to Paragraph 2(b). Baronet acknowledges that actual Cash Flow distributions and actual Sale or Refinancing Proceeds paid to Baronet may be more or less than the amounts set forth on the Pro Forma Cash Flows, and shall be based on actual amounts of Cash Flow and actual Sale or Refinance Proceeds rather than the projected amounts set forth on the Pro Forma Cash Flows. Neither [of the Partnerships] has

4

any obligation to update, revise, supplement, or replace any Pro Forma Cash Flow. To the extent the Pro Forma Cash Flows differ in any respect from the Cash Flow distribution provisions of the Partnership Agreements, the Partnership Agreements control."

The Settlement Agreement also included an arbitration provision, which read as follows: "This Agreement may be enforced pursuant to California Code of Civil Procedure section 664.6. The Parties agree that any and all disputes or claims arising out of or in any way related to this Agreement, including without limitation, fraud in the inducement of this Agreement, or relating to the general validity or enforceability of this Agreement, shall be submitted to final and binding arbitration before George Calkins of JAMS. If George Calkins is unavailable, the Parties shall agree on another, single arbitrator, and if the parties cannot agree on a single arbitrator then JAMS shall appoint an arbitrator pursuant to its rule and procedures. Any arbitration arising out of or related to this Agreement shall be conducted in accordance with the expedited procedures set forth in the [JAMS Rules]. Arbitration costs shall be initially split equally between the Parties. In any arbitration arising out of or related to this Agreement, the arbitrator(s) shall award to the prevailing party, if any, the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof."

The heart of Baronet's subsequent arbitration claims against the Partnerships centers on the extent to which the Proformas misrepresented future cash flow expectations for each

project, and the extent to which Baronet relied upon the Proformas when entering into the Settlement Agreement.

## C.     First Arbitration

### 1. Baronet's Claim

In June 2013, Baronet initiated an arbitration to recover sums due under the Settlement Agreement, asserting claims for breach of contract, and intentional and negligent misrepresentation on the theory that for 2012 and 2013, the Partnerships had underpaid based on the Proformas for the Oakwood and Breezewood projects.  The arbitration did not address payments owed for Victorville because the Victorville Proforma did not project cash flow until the year 2014.  Baronet claimed $467,417 in damages, plus attorney fees and costs.  The arbitration took place in December 2014.

### 2. Final Award in the First Arbitration

Calkins's final award, issued in February 2016, found in favor of Baronet on its negligent misrepresentation claim, reasoning that the Partnerships had negligently misrepresented the basis for the Proformas for the Oakwood and Breezewood projects.  Calkins awarded Baronet a net award of $215,249 for both projects in the 2012-2013 time frame.  Calkins's award also granted Baronet declaratory relief that, in calculating cash flow payments to Baronet, the Partnerships could not offset such payments with attorney fees and costs for prior legal actions and disputes arising from the Settlement Agreement.

The Partnerships satisfied the damages award in March 2016, and the trial court entered a stipulated judgment memorializing the declaratory relief.  Notably, and pertinent to the second arbitration, the Partnership paid the first arbitration award by using cash flows from years 2014 through 2016 and a zero percent interest loan from one of the limited partners.

**D.    Second Arbitration**

*1.  Baronet's Claim*

In May 2016, Baronet initiated a second arbitration to recover additional sums, asserting claims to recover underpayments for the years 2014 through 2016, related to all three projects:  Oakwood, Breezewood, and Victorville.[3]  Baronet claimed the Partnerships had again breached the Settlement Agreement, this time by improperly offsetting attorney fees and the damages awarded from the first arbitration against projected cash flow payments.  Baronet also argued that the Victorville Proforma, which projected a 3 percent annual increase in both revenues and expenses, failed to disclose two key facts which were available to the Partnerships at the time:  (1) that a "development" proforma—distinct from the Proforma provided to Charles Ashley in March 2012—projected lower annual increases for revenues (2.5 percent) and higher annual increases in expenses (3.5 percent), presumably reducing available cash flow; and (2) that the Victorville project had a $12.1 million financing

_____

[3] Baronet's claim initially sought payment for 2014 and 2015, and was later amended to include 2016.

7

shortfall that was addressed by a cash advance or voluntary loan by one of the limited partners, the repayment of which might also have an impact on the project's cash flow.

### 2. Final Award in the Second Arbitration

The second arbitration took place in March 2019. Addressing Baronet's arguments about the Victorville Proforma, Calkins again concluded that the Proforma was negligently prepared. The existence of the development proforma and the financing shortfall was material information, and while Calkins rejected Baronet's claim of intentional misrepresentation, he found the Partnerships' failure to disclose that material information caused damage to Baronet. Calkins also reasoned that the Partnerships were not permitted to deduct attorney fees and certain management fees from all three of the projects, and he awarded those amounts to Baronet as damages. Calkins noted that, while the Proforma projections for all three projects for the years 2014 through 2016 totaled over $1.43 million, the Partnerships had paid only $9,584 to Baronet. The arbitrator's final award, issued in November 2019, granted Baronet a little over $800,000 in damages, relating to the three projects. Once attorney fees, costs, and interest were included, the total award came to more than $1.5 million.

After hearing both the Partnerships' motion to vacate and Baronet's motion to confirm the arbitration award, the trial court entered judgment confirming the arbitrator's final award in September 2020, including declaratory relief that the Partnerships "may not offset their cash flow or operating income to the extent factored into the cash flow payments to [Baronet] by

8

any amounts the [Partnerships] have incurred or may incur in the future as to all disputes, past, present, and future, arising from the [settlement] [a]greement, the [first arbitration] [a]ward, and [the second arbitration] [a]ward." The Partnerships paid the monetary portion of the judgment in full.

## E.  Third Arbitration

### 1. Baronet's Claim

In March 2021, Baronet initiated a third arbitration to recover additional sums, asserting claims to recover underpayments for the years 2017 through 2019. Baronet alleged causes of action for negligent misrepresentation, breach of contract, and breach of implied covenant of good faith and fair dealing, and each cause of action included an allegation that Calkins had already found in favor of Baronet "for the years of 2014-2016, and thus, all that remains for determination during this Arbitration is the damages to Baronet for the years of 2017-2019."

### 2. Preliminary Proceedings

In April 2021, the Partnerships sent a notice that they were exercising their right to disqualify arbitrator Calkins, and by June 2021, JAMS appointed a new arbitrator named Deborah Ballati. Nothing in the record shows that Baronet raised any

timely objection to the disqualification notice or Ballati's appointment as arbitrator.[4]

Both sides filed opposing pre-hearing motions seeking a summary disposition of whether Baronet's claim "to recover further damages related to the negligent preparation of pro formas regarding the Victorville Project" was barred by Calkins's award in the second arbitration. Baronet's motion argued that Calkins's prior award established that the Proformas had been negligently prepared, and that each element of Baronet's negligent misrepresentation claim had been fully litigated. Baronet also argued that collateral estoppel should prevent the Partnership's efforts to present new evidence or defenses with respect to the Victorville proforma, or to raise any argument about the method for calculating damages. The Partnerships' motion argued Baronet's new claims for damages pertaining to 2017 through 2019 were barred because Baronet failed to bring those claims as part of the second arbitration.

Ballati issued an order resolving both motions, concluding that: (1) because the question of the Proformas' negligent preparation was fully litigated in the earlier arbitration, the Partnerships were "barred from challenging the conclusion that the Victorville pro forma was negligently prepared;" (2) Baronet's current claim for damages for the years 2017 through 2019 "was not conclusively determined in the prior arbitration, nor was it waived or barred by doctrines of res judicata, issue preclusion or other applicable standards," and so Baronet could seek damages in the current arbitration; and (3) the extent of recoverable

---

[4] We deny the Request for Judicial Notice filed by the Partnerships on October 16, 2025, seeking notice of certain post-judgment correspondence between Baronet's counsel and JAMS.

damages "shall be determined based on evidence to be presented in this proceeding, but limited by the limitations on calculation of such damages determined in the prior proceeding before Arbitrator Calkins, and in his Final Award."

### 3. Arbitration Hearing

The arbitration was conducted over three days in November 2022, with testimony from the principal persons involved in negotiating the Settlement Agreement and preparing the Proformas—Ashley, Costa, and Tetrault—as well as an expert witness testifying for the Partnerships. During Ashley's cross-examination and over Baronet's objection, counsel for the Partnerships elicited testimony that Ashley was aware of the existence of the development pro formas and the financing shortfall for the Victorville project, and that the information was not a factor in his decision to enter into the settlement agreement.

### 4. Final Award

Ballati issued her final award in September 2023, summarizing the parties' competing positions on the binding effect of Calkins's findings in the first and second arbitration awards: "In the current arbitration, the Parties introduced substantial evidence to prove what the two awards in the earlier arbitrations did (or did not) decide, and the implications of those decisions for the claims involving the Victorville project involved in this arbitration." Baronet argued that the only question at issue was the amount of cash flow damages for the period 2017-

2027 for the Victorville project, and that even in the face of conflicting or additional testimony, Ballati was bound by Calkins's findings and conclusions. The Partnerships argued that the second arbitration award was a full award of damages for the negligent misrepresentation, so Baronet was precluded from collecting any additional damages for that claim. The Partnerships also argued that Calkins's second arbitration award was grounded in speculation about what Ashley and Baronet "knew or did not know before signing the Settlement Agreement, which speculation . . . is no longer warranted or justified" based on the testimony elicited from Ashley on cross-examination.

Ballati's final award included detailed summaries of the first and second arbitrations before turning to the questions at issue in the third arbitration. Ballati reasoned that "Baronet's claim for damages for the years 2017 through 2019 was not conclusively determined in the prior arbitration, nor was it waived or barred by doctrines of res judicata, issue preclusion or other applicable standards. Accordingly, Baronet may seek such damages in this proceeding." In addition, the question of calculating damages through 2027 was at issue. Ballati then reviewed the portions of Ashley's testimony about his knowledge of the development of the proformas and the financing shortfall, finding such evidence "persuasive and a basis to conclude in this arbitration, contrary to" Calkins's findings in the second arbitration award "that when Mr. Ashley signed the Settlement Agreement, he knew all the relevant information important to evaluating the risk he was taking regarding the expense and revenue projections and agreed to take that risk anyway by signing the Settlement Agreement." Ballati rejected Baronet's argument that she should not consider Ashley's sworn testimony

12

in the third arbitration, and based on that testimony, Ballati concluded that future cash flow payments should be based on the formula set forth in the Settlement Agreement, and not on the Proforma projections attached to the Settlement Agreement. Ballati rejected Baronet's damages claims and awarded the Partnerships over $800,000 in attorney fees and costs.

## F.     Trial Court Proceedings

In November 2023, the Partnerships petitioned the trial court to confirm the third arbitration award.  In April 2024, the court confirmed Ballati's arbitration award and denied Baronet's petition to vacate.  The trial court rejected Baronet's argument that Ballati had exceeded her powers, instead reasoning that the court "cannot review the arbitrator's alleged error in law in disregarding principles of collateral estoppel and res judicata in her arbitration decision."

A notice of entry of judgment was filed on July 16, 2024, and Baronet filed a timely notice of appeal on August 21, 2024.

## DISCUSSION

Baronet contends the trial court erred in confirming the arbitration award, and instead it should have granted Baronet's motion to vacate the award under section 1286.2, subdivision (a)(4).  Baronet specifically argues that Ballati exceeded her authority when she failed to give res judicata effect to Calkins's prior finding of negligent misrepresentation.

Baronet's briefing tries mightily to shoehorn the arbitrator's purported error into the narrow confines of section

13

1286.2, subdivision (a)(4), which requires a trial court to vacate an award when an arbitrator has exceeded his or her authority. As we explain below, we are unpersuaded by Baronet's efforts, and conclude that the trial court was correct in rejecting Baronet's arguments and confirming the arbitrator's award.

## A. Standard of Review

Code of Civil Procedure, section 1286.2 sets forth the grounds upon which a court must, if properly requested, vacate an arbitration award. As relevant here, a trial court must vacate an award when "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (§ 1286.2, subd. (a)(4).) We independently review whether an arbitration award exceeds an arbitrator's powers. (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 376, fn. 9 (*AMD*); *Safari Associates v. Superior Court* (2014) 231 Cal.App.4th 1400, 1408.) In so doing, "we may not review the validity of the arbitrator's reasoning, the sufficiency of the evidence supporting the award, or any errors of fact or law that may be included in the award." (*Harris v. Sandro* (2002) 96 Cal.App.4th 1310, 1313, citing *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 11 (*Moncharsh*).)

## B. Res Judicata Effect of Prior Arbitration Award

Baronet's argument starts with the general proposition that confirmed arbitration awards are given binding and preclusive effect on matters of fact and law. The problem is that the caselaw Baronet cites to and relies upon involves situations

14

in which a trial court—not an arbitrator—is called upon to give preclusive effect to an earlier arbitration award.  (See, e.g., *Kelly v. Vons Companies, Inc.* (1998) 67 Cal.App.4th 1329, 1335–1336 [reviewing a trial court's grant of summary judgment, res judicata applies not just to prior judicial decisions, but to arbitration awards as well]; *Thibodeau v. Crum* (1992) 4 Cal.App.4th 749, 754, 758–760 [prior arbitration against contractor had res judicata effect in later lawsuit in court against a subcontractor, regardless of whether arbitration award was confirmed].)  It is uncontroverted that a trial court's misapplication of the doctrine of res judicata may be reviewed by an appellate court.  (See *Samara v. Matar* (2018) 5 Cal.5th 322, 326–327, 338.)

That is not the situation presented here.  Rather, Baronet relies exclusively on what Baronet argues was the *arbitrator's* error: that in the third arbitration, Ballati ignored the preclusive effect of Calkins's finding made in the second arbitration (i.e., that Baronet had proven its negligent misrepresentation claim against the Partnerships).  However, when an arbitrator—as opposed to a trial court—has erred in deciding whether a finding from a prior arbitration has preclusive effect in the current arbitration, the trial court's authority to review and reverse such an error is strictly limited by the provisions of section 1286.2.

## C.     Decision Not in Excess of Arbitrable Issues

In an effort to fit the square peg of the third arbitration award into the round hole of section 1286.2, subdivision (a)(4) as a basis to vacate the unfavorable award, Baronet argues that Ballati's decision on the issue of res judicata was not authorized,

15

either by the settlement agreement or by California law. This argument is unconvincing because it ignores the fact that the parties not only agreed that any disputes or claims arising out of the settlement agreement would be subject to arbitration, they also briefed the issue of res judicata and argued the issue at the arbitration hearing.

Separately, Baronet contends that the award must be vacated because Ballati lacked subject matter jurisdiction to make the award she did. In essence, Baronet argues that its statement of claim and Ballati's earlier motion rulings limited the scope of Ballati's authority so she could not make an award that did not give preclusive effect to the prior negligent misrepresentation finding. On this point as well, we are unpersuaded by Baronet's attempt to frame the third arbitration award as exceeding the arbitrator's authority such that it must be vacated under section 1286.2, subdivision (a)(4).

"It is for the tribunal in which a claim of res judicata is made to pass on the validity of such a contention, including a determination of the effect of the prior judgment. [Citations.] It follows that, though erroneous, the arbitrator's determination that the findings of fact in the [prior] action were not res judicata, was within, and not in excess of, his powers." (*Interinsurance Exchange of Auto. Club v. Bailes* (1963) 219 Cal.App.2d 830, 836 (*Interinsurance*).) The court in *Durand v. Wilshire Ins. Co.* (1969) 270 Cal.App.2d 58 (*Durand*) applied the same reasoning, concluding that when parties seek a ruling by the arbitrator on an issue of collateral estoppel, the arbitrator's decision on the issue, even if erroneous, is not subject to judicial review. (*Id.* at pp. 60–63.) "[A]rbitrators do not exceed their powers merely by erroneously deciding a contested issue of law or fact[.]" (*AMD,*

16

*supra*, 9 Cal.4th at p. 366, citing *Moncharsh, supra*, 3 Cal.4th at p. 28; see also *Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179, 1184 (*Gueyffier*) [subdivision (a)(4) of section 1286.2 "does not supply the court with a broad warrant to vacate awards the court disagrees with or believes are erroneous"].)

An arbitrator's application of collateral estoppel or res judicata, even if erroneous—a question we decline to decide in this opinion—is not a basis for vacating an arbitration award. "Arbitrators do not ordinarily exceed their contractually created powers simply by reaching an erroneous conclusion on a contested issue of law or fact, and arbitral awards may not ordinarily be vacated because of such error, for ' "[t]he arbitrator's resolution of these issues is what the parties bargained for in the arbitration agreement." ' [Citation.]" (*Gueyffier, supra*, 43 Cal.4th at p. 1184 [arbitrators have broad powers absent express limitations in the contract].) Nothing in Baronet's briefing convinces us to depart from the reasoning articulated in *Interinsurance* and *Durand* that an arbitrator's application of the doctrine of res judicata is not subject to judicial review. (*Interinsurance, supra*, 219 Cal.App.2d at pp. 835–836; *Durand, supra*, 270 Cal.App.2d at pp. 61–63.)

## D.    Arbitral Finality

Taking a slightly different tack, Baronet also contends that Ballati's award violates the public policies of arbitral finality and obedience to court orders because it is inconsistent with Calkins's second arbitration award and the judgment confirming that award. Baronet cites to *City of Palo Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327, 338 (*Palo Alto*), to

argue that Ballati violated the principle of arbitral finality when she considered new evidence and departed from the final and binding findings from the second arbitration and the trial court's judgment.

We are unpersuaded by Baronet's argument, and we find *Palo Alto* inapposite. In *Palo Alto*, if the city complied with the arbitrator's order it would violate a prior court-ordered injunction. (*Palo Alto, supra*, 77 Cal.App.4th at p. 339.) Here, the Partnerships had already complied with the judgment confirming the second arbitration award by paying the amounts due, and compliance with the third award would not put either party in the position of violating the second award.

"The principle of arbitral finality, the practical demands of deciding on an appropriate remedy . . . , and the prior holdings of [the California Supreme Court] all dictate that arbitrators, unless expressly restricted by the agreement or the submission to arbitration, have substantial discretion to determine the scope of their contractual authority to fashion remedies, and that judicial review of their awards must be correspondingly narrow and deferential." (*AMD, supra*, 9 Cal.4th at p. 376.)

In *Ortiz v. Elmcrest Care Center, LLC* (2024) 106 Cal.App.5th 594, our Division Four colleagues examined an arbitrator's power to amend an award, but their overview of the purpose of arbitral finality is just as relevant to the issues we are considering in this case: " 'Ensuring arbitral finality . . . requires that judicial intervention in the arbitration process be minimized.' (*Moncharsh, supra*, 3 Cal.4th at p. 10.) This principle of limited judicial review 'is a well-understood feature of private arbitration, inherent in the nature of the arbitral forum as an informal, expeditious, and efficient alternative means of

18

dispute resolution.' (*Vandenberg* [*v. Superior Court* (1999)] 21 Cal.4th [815,] 831.)  Our Supreme Court has long emphasized 'private arbitration is a process in which parties voluntarily trade the safeguards and formalities of court litigation for an expeditious, sometimes roughshod means of resolving their dispute.' (*Ibid.*)  'The traditional rule is that " '[a]rbitrators, unless specifically required to act in conformity with rules of law, may base their decision upon broad principles of justice and equity, and in doing so may expressly or impliedly reject a claim *that a party might successfully have asserted in a judicial action.*' . . . 'The arbitrators are not bound to award on principles of dry law, but may decide on principles of equity and good conscience, and make their award *ex aequo et bono* [according to what is just and good].' [Citation.]  'As a consequence, . . . "[p]arties who stipulate in an agreement that controversies . . . shall be settled by arbitration, may expect not only to reap the advantages that flow from the use of that nontechnical, summary procedure, but also to find themselves bound by an award reached by paths neither marked nor traceable and not subject to judicial review." ' " '  ([*Vandenberg, supra*, 21 Cal.4th at pp.] 831–832; see *Moncharsh*, at pp. 10–11.)" (*Ortiz, supra*, 106 Cal.App.5th at p. 607.)

We reject Baronet's argument that the public policies of arbitral finality and obedience to court orders mandates judicial review of an arbitrator's possibly erroneous application of res judicata.  To the contrary, the principle of arbitral finality supports the conclusion that Ballati's award is not subject to judicial review.

19

# DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to plaintiffs and respondents Victorville/Desert Springs, L.P., and Affordable Multi-Family, LLC.

NOT TO BE PUBLISHED.


MOOR, J.

WE CONCUR:


HOFFSTADT, P. J.


KIM (D), J.